H. Sherm NELSON, Joanne M. Nelson, Erwin Heimsoth, Lorene Heimsoth, Larry Wogahn, Elmer C. Gertsmeier, Eva Gertsmeier, Glen A. Dyslin, Jr., Kenneth Duane Peterson, Marjorie Mavis Peterson, Swen Albert Swanson, Bertha Elizabeth Swanson, Louie Witt, Everett W. Hultgren, Mildred I. Hultgren, John Merrick Patterson, and Mildred Arlene Patterson, Appellants,

v.

PAMPERED BEEF–MIDWEST, INC., Bryant Beef, Inc., and Robert Bryant, Appellees.

No. 64396.

Supreme Court of Iowa.

Nov. 12, 1980.

Rehearing Denied Dec. 11, 1980.

James L. Kramer and Dale A. Johnson of Johnson, Erb, Latham & Gibb, P. C., Fort Dodge, for appellants.

Robert R. Eidsmoe of Gleysteen, Harper, Eidsmoe, Heidman & Redmond, Sioux City, and David Sayre, Cherokee, for appellees.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, McCORMICK, and McGIVERIN, JJ.

UHLENHOPP, Justice.

This is an appeal in equity in which creditors seek to subject property formerly owned by their corporate debtor to an equitable lien. We review the case de novo. We give weight to the trial court's fact findings but are not bound by them. Iowa R.App.P. 14($f$)(7).

We condense the facts to those necessary for determination of the case. The corporation in question was Pampered Beef–Midwest, Inc. (PBM). The stock of PBM was actually owned in its entirety by another corporation, Pampered Beef, Inc., but this is not determinative and we will consider the stockholders of Pampered Beef, Inc. as the PBM stockholders. At the times in question, PBM was owned by Dale P. Smith, Jr. (47%–he operated PBM), Robert Bryant (47%), Ron Steffes (5%), and Tom Parks (1%).

PBM owned livestock, feed, medicines, vehicles, and equipment, and an extensively improved feedlot in Cherokee County, Iowa. It brought young cattle to the feedlot, raised and fattened them, and delivered them to a packer. In 1973 it had obligations secured by liens on its personal property, and it owed Travelers Insurance Company $2,000,000 secured by a mortgage on the feedlot. It had a net worth of about $1,800,000.

On September 20, 1973, PBM entered into a loan agreement with banks of Albuquerque, New Mexico, and Cherokee, Iowa, for funds to retire existing loans and to operate the feedlot. The agreement contained various covenants and granted the banks a lien on PBM's personal property. Smith and his wife guaranteed the loan. PBM borrowed about $2,600,000 under the agreement.

The feedlot had some environmental problems, and neighbors sued PBM for nuisance. We will refer to those neighbors, who are also the plaintiffs in this suit, as Nelsons. On October 31, 1974, Nelsons and PBM settled that lawsuit for $80,000. PBM paid part of this amount at the time and agreed to pay the rest in installments; $40,000 was paid altogether. Under the settlement Nelsons could accelerate the balance on default and take judgment.

In the spring of 1975 PBM had about 13,000 cattle and they were worth about $60 per hundredweight. The cattle market collapsed, and by late summer the cattle were worth about $20 per hundredweight. PBM's net worth dropped to a negative figure of about $1,400,000.

At that time PBM owed the banks about $2,200,000. PBM defaulted on the required payments on the banks' loan. The banks demanded payment, but PBM could not pay. The banks could not collect from Smiths, the guarantors, for apparently their only substantial asset was their home.

The banks retained an attorney to foreclose the security agreement on PBM's personalty, and the attorney prepared the petition. PBM was headed for foreclosure and bankruptcy.

Robert Bryant, one of PBM's stockholders, personally had equities in some other properties. He tried to get the banks not to foreclose, but they refused to negotiate at all unless Bryant and his wife would first guarantee the 1973 loan agreement. Bryant and his wife did so. Bryant thus got the banks to talk but at the price of giving them leverage: PBM's personal property was insufficient to pay the banks' loan, Smiths were not good for the deficiency, but the banks could take Bryants' own assets under the guaranty. Negotiations between the banks and Bryant went forward.

The banks were not satisfied with Smith's management. Bryant was trying to avert foreclosure and bankruptcy, and he had substantial equities in his other properties. In the fall of 1975, he and the banks worked out a complicated arrangement involving a number of terms. Bryant paid the Cherokee bank about $400,000, part of which he borrowed from other banks. Thereafter that bank was out of the picture. Bryant bought all of the personal property of PBM for the amount of the (then) Albuquerque bank's secured loan. This was accomplished by the Bryants' taking over the bank's loan as the primary obligors and giving the bank their notes for that debt (one note was also signed by Smith), and by PBM's conveying its personalty to Bryant by bill of sale on October 2, 1975. Bryant contends he thus paid $2,300,000 for assets worth $1,158,980.33–at that time PBM had 4593 cattle. The bank also demanded additional security from Bryants personally. Bryants gave the bank a

second mortgage on their home, which had an equity of about $120,000, a second mortgage on a quarter–section farm they owned having an equity of about $120,000, a second mortgage on a hog farm which had an equity of about $325,000, a second mortgage on 3300 additional cattle Bryant owned personally having an equity of about $330,000, and an assignment of Bryant's life insurance having a cash value of about $75,000. In addition, Bryant agreed not to sell or encumber his half interest in a 556–acre farm where his parents lived; that interest was worth about $336,000. The arrangement had numerous other terms for the bank's protection.

The bank withheld foreclosure and bankruptcy, and granted Bryant additional time to pay the loan.

Bryant took over the feedlot, operated it as "Bryant Beef," and made a number of changes. He had purchased the personal property but the feedlot was owned by PBM and was mortgaged to Travelers. PBM leased the feedlot to Bryant Beef. PBM's payments to Travelers were to come from Bryant Beef's rental payments to PBM. Bryant testified that the rental payments were insufficient for the purpose and PBM stockholders agreed to provide additional funds. He also testified those funds were not forthcoming.

Cattle prices remained depressed and the finances of PBM and Bryant Beef deteriorated further. Bryant was able to pay the bank and Travelers a total of about $77,000 a month for several months from his personal funds, but both the loan payments to the bank and the mortgage payments to Travelers became delinquent. Both of these lenders were about to foreclose. PBM and Bryants faced financial ruin.

Bryant strove to get further extensions of time from the bank and Travelers. Eventually an arrangement evolved which had several interdependent facets. The arrangement was consummated in March 1976. As further security to Travelers, Bryant gave it a second mortgage on his half interest in the 556–acre farm, apparently the last of his assets. He formed a

corporation known as Bryant Beef, Inc., with Bryant as the sole shareholder, director, and officer. That corporation purchased the feedlot from PBM on March 4, 1976, by taking over the mortgage as the primary obligor, and Bryant conveyed to the new corporation the remaining personal property of that which PBM had previously conveyed to him. To make himself a more acceptable debtor to the bank, Bryant obtained releases of substantial guarantees he was under for other corporations by relinquishing his stock in those corporations to their stockholders. PBM's other officers resigned, and PBM came to an end by failing to make its annual report to the secretary of state.

PBM had unsecured creditors also, including Nelsons. These creditors were not paid and no provision was made to pay them. On January 19, 1977, Nelsons obtained judgment against PBM for $40,000 under the prior settlement. PBM having no assets, Nelsons brought the instant suit in equity in July 1977 against PBM, Bryant Beef, Inc., and Bryant.

The suit is in two counts. In the first count Nelsons allege that PBM transferred its personal property to Bryant and its real property to Bryant Beef, Inc., that the transfers are void, and that Nelsons have a lien on the property. They thus pray that the transfer be held void and that their judgment against PBM be confirmed as an equitable lien on the property of Bryant and Bryant Beef, Inc., and for such further relief as is equitable. In the second count they reallege the transfers, and they further allege that the transferees were a mere continuation of PBM, the transfers were fraudulent, and the transferees agreed to assume PBM's debts. Again they pray that the transfers be held void and that their judgment against PBM be confirmed as a lien on the property of Bryant and Bryant Beef, Inc., and for such further relief as is equitable.

After trial, the trial court held for PBM, Bryant, and Bryant Beef, Inc. Nelsons appealed.

In their appeal, Nelsons claim they are entitled to an equitable lien on the property PBM transferred to Bryant and Bryant Beef, Inc. They state, "This case is controlled by *Smith v. Village Enterprises, Inc.,* 208 N.W.2d 35 (Iowa 1973)"—a decision we will consider in due course. They expound their position thus in their first proposition:

> Where Pampered Beef Midwest Inc. transferred all of its assets to Robert Bryant and the corporation he controlled with the result that Pampered Beef Midwest Inc. [ceased] to exist without having paid its debts, Robert Bryant and Bryant Beef Inc. took the assets subject to [an] equitable lien in favor of Pampered Beef Midwest Inc.'s judgment creditors.

Bryant and Bryant Beef, Inc. present an issue of waiver which we must also consider, and our resolution of the appeal requires us to deal with a dispositional question as well.

I. *Nelsons' rights arising from the transfers.* The case involves a transfer by a corporation of its assets without payment of the corporation's unsecured debts or provision for their payment. Such a transfer may occur in a way which affords the unsecured creditors no remedy. *Allen v. North Des Moines Methodist Episcopal Church,* 127 Iowa 96, 98–99, 102 N.W. 808, 809–10 (1905). *See also Warfield v. Marshall County Canning Co.,* 72 Iowa 666, 34 N.W. 467 (1887). On the other hand, the transfer may occur under circumstances which give those creditors an *in rem* right (an equitable lien on the transferred property) or an *in personam* right (personal liability of the transferee), and in a given case a combination of those rights may arise. 19 Am. Jur.2d *Corporations* §§ 1546-1553 (1965); 19 C.J.S. *Corporations* §§ 1377–1382 (1940).

A. Rights *in rem.* The leading case on the equitable lien by the transferor–corporation's creditors is *Luedecke v. Des Moines Cabinet Co.,* 140 Iowa 223, 118 N.W. 456 (1908). This court there held that unless the transfer is to a good–faith transferee for value in the ordinary course of business, or the transferor pays or makes provision for the payment of its creditors, the creditors may follow the transferred property into the hands of the transferee to satisfy their claims. This court has since applied the rule in various fact settings. One of these cases is *Farnsworth v. Muscatine Produce & Pure Ice Co.,* 177 Iowa 21, 158 N.W. 741 (1916). There the court summarized the *Luedecke* doctrine thus:

> The holding of the court in that case is that a general creditor has not such a lien upon the property of the corporation that he can pursue it in the hands of a bona fide purchaser for a full consideration in cash, or its equivalent; that the true rule is that, where the property passes to one who is not a good–faith purchaser in the ordinary course of business, a creditor has an *equitable right to a lien,* which will be enforced by a court of equity in his favor, against the property in the hands of a purchaser not protected under what is called the modified rule. The holding is that the creditors of a corporation *in a proper case* have an equitable right or lien upon the assets of a corporation, and may pursue this right and have an equitable lien established against the property in the hands of one who is not a good–faith purchaser. The rule is recognized that, where one corporation transfers all its assets to another, not in the ordinary course of business, the very circumstances of the case imply full knowledge on the part of the transferee of all the facts necessary to charge the property in the hands of the purchaser with the debts of the seller; and this is especially true where the purchasing corporation is a product of the ingenuity of the stockholders of the old corporation, who took the property with full knowledge of the right of the plaintiff and transferred it to the new body of their own creation.

*Id.* at 36, 158 N.W. at 747. The court applied the principle again in *German American State Bank v. Farmers & Merchants Savings Bank,* 203 Iowa 276, 211 N.W. 386 (1926), and in *Andrew v. American Savings Bank & Trust Co.,* 219 Iowa 1059, 258 N.W. 921 (1935) (reviews prior cases).

A recent application of *Luedecke* is *Smith v. Village Enterprises, Inc.*, 208 N.W.2d 35 (Iowa 1973). This court there quoted authorities describing the equitable lien as " 'a right not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts,' " or as " 'the right to have property subjected in a court of equity to the payment of a claim.' " *Id.* at 38.

■ The facts of this case bring it squarely within the *Luedecke* rule. We have here two separate transactions and ensuing transfers by PBM of its property. The first overall transaction began with the banks' obtaining Bryants' guarantee of their loan, and culminated in Bryant's taking over that loan as his own debt, giving the banks additional security in his own assets, and purchasing PBM's personal property; and in the bank's resulting extension of time to Bryant. The other overall transaction began with the impending foreclosures by the Albuquerque bank and Travelers of their security interests and real estate mortgages, and culminated in Bryant's giving additional security on his last asset, disentangling himself from guarantees of other corporations' obligations, taking over management, creating his wholly owned Bryant Beef, Inc., and conveying the personal property to that corporation; in that corporation's taking over the Traveler's loan as its own debt and purchasing PBM's feedlot; and in extensions of time to Bryant Beef, Inc. by the bank and Travelers.

We need not say whether Bryant and his corporation Bryant Beef, Inc. were good faith transferees or whether they gave value in connection with the two PBM transfers. Manifestly these transfers were not in the "ordinary" course of business. The whole setting was extraordinary and in the face of financial disaster. The transferor did not pay its unsecured debts or make provision for their payment. As unsecured creditors, Nelsons therefore had an equitable lien which followed PBM's personal and real property into the hands of Bryant

Beef, Inc. Nelsons are correct that this case is governed by *Smith* and *Luedecke.*

B. Rights *in personam.* Nelsons' petition is unclear on whether they claim that Bryant and Bryant Beef, Inc. are personally liable on their judgment against PBM. Such a claim is quite different from a claim of an equitable lien. A claim of personal liability enables the creditor to satisfy the debt out of any of the debtor's nonexempt assets. Nelsons do not specifically pray that Bryant and his corporation be held personally liable; they ask that the property be subjected to the judgment against PBM. They seem to be proceeding on an equitable lien basis. But in the view we take of the case, we find no necessity to resolve the question of the breadth of Nelsons' petition and prayer.

■ The circumstances of a transaction may give a creditor an equitable lien on the transferred property but not render the transferee personally liable. Indeed, that is the ordinary case, when the creditor prevails. The creditor must establish additional independent grounds for personal liability before it may be held to exist. The court explained this subject in *Allen v. North Des Moines Methodist Episcopal Church*, 127 Iowa 96, 98- 99, 102 N.W. 808, 809–10 (1905) (citations omitted):

> That the members or some of the members of an insolvent or dormant corporation may organize a new corporation for the promotion of the same purposes to which the old one is dedicated without becoming chargeable with its debts or obligations is too well settled for dispute. On the other hand, it is equally well settled that the mere change in the name of a corporation has no effect upon its legal status or upon the rights of creditors. Among corporations organized for business purposes it has been, and still is, a matter of most frequent occurrence that in the initial struggle for existence they become hopelessly insolvent. Under such circumstances the organization of a new corporation to build, if possible, a successful business on the ruins of the old is entirely legitimate, whether considered

as a proposition of law or of morals. The fact that the new organization embraces the old membership is immaterial, and in itself affords no reason why it should be held liable for the debts of the old corporation. True, the courts will watch such reorganization with care, that no fraud be accomplished, and to that end will insist that there shall be a *bona fide* intention to make a new and independent organization, and that it shall not take over, absorb, or convert to its use the property or assets of the old corporation to the prejudice of its creditors. There must be something more than a mere succession in business to charge the successor with the debts or delinquencies of the party succeeded. The legal identity of the new corporation with the old ordinarily depends upon the intention of the incorporators.

In that case the court found that the incorporators intended to create a new corporation, not merely an extension of the old one.

Subsequently this court reached the same result in *Luedecke*, 140 Iowa at 226, 118 N.W. at 457 (citations omitted):

Appellants challenge that part of the decree rendering personal judgment against the undertaking company, the successor to the assets of the cabinet company and we are constrained to sustain them in this position. In order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that (a) there be an agreement to assume such debts; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact. None of these things appear in this case, and in our opinion the court was in error in rendering a personal judgment against the purchasing corporation.

Similarly, the court found an equitable lien but held that two individual transferees were not merely one entity with the transferring corporation, in *State v. Simmer Oil Corp.*, 231 Iowa 1041, 1045–46, 2 N.W.2d 760, 762 (1942). The court stated:

We turn now to the claim that appellees should be made personally liable. We are satisfied with the ruling of the trial court that they should not be. There was admittedly much laxity in keeping the corporation books. But this is not surprising when it is kept in mind that this was a family affair without outside stockholders. And if it appeared that sometimes the entries were not made as correct bookkeeping would require, the books do, nevertheless set forth sufficient facts to distinguish the corporate affairs from the private interests of the Simmer family.

Among the expressions in the opinion of the trial court which meet our approval we quote the following:

"Upon the claim of plaintiffs and intervener that the corporation and Leonard Simmer and Agnes Simmer were in fact one entity and that the debts of the corporation should be held to be the debts of Leonard and Agnes Simmer this court does not believe that the evidence would justify such a holding."

A recent case which is a classic illustration of a "mere continuation" of a transferor is *Arthur Elevator Co. v. Grove*, 236 N.W.2d 383 (Iowa 1975). There an elevator changed its form of business organization from a partnership to a corporation. Describing the change in the form of organization, this court quoted or used several phrases: " 'put on another coat,' " " 'we had a partnership incorporate,' " "the partnership transformed itself into a corporation," and "The company apparently continued its business in the same manner but for the change in organization." *Id.* at 392, 393.

The elevator corporation sued a farmer on an account, the items of which straddled the date on which the change was made from partnership to corporate form. The farmer counterclaimed for services he performed for the elevator during the time it was in partnership form. This court found the elevator, though now a corporation, liable on the counterclaim.

■ A similar result follows in the closely related cases involving mergers and consolidations. In those cases the changed entity ordinarily remains liable for the prior debts. 19 Am.Jur.2d *Corporations* § 1554 (1965); 19 C.J.S. *Corporations* § 1630 (1940). A business cannot shrug off personal liability to its creditors simply by merging, consolidating, switching from partnership to corporate form or vice versa, or changing its name.

■ The four situations in which *Luedecke* states a transferee becomes personally liable for transferor–corporation debts are an agreement to assume the debts, a consolidation of two corporations, a mere continuation of the transferor corporation, and fraud in fact. We have none of these in the present case. Neither Bryant nor Bryant Beef, Inc. agreed to assume the unsecured debts; PBM and Bryant Beef, Inc. did not consolidate; no intention existed that the transferees would simply be continuations of PBM and, in contrast to *Arthur Elevator*, a marked difference existed between the transferor and transferees; and no actual fraud existed–on the contrary, Bryant struggled desperately to stave off foreclosure and bankruptcy and eventually threw all of his own resources into the fray. Neither Bryant nor Bryant Beef, Inc. became generally personally liable to Nelsons. As we will hold, however, Bryant and his corporation may have become personally liable to a limited extent to Nelsons.

II. *Waiver.* Bryant and his corporation contend that in the settlement of the action for nuisance, Nelsons did not obtain a clause giving them security for the unpaid balance of the settlement; hence Nelsons may not have an equitable lien on the transferred assets.

■ We do not find merit in this contention. True, Nelsons did not have a mortgage or other lien on PBM's assets at the time of the transfers. But so long as PBM had its assets, Nelsons could have obtained judgment and looked to those assets to the extent of PBM's equity in them. The settling parties in the case for nuisance were contemplating that sort of situation. They were not contemplating transfers by PBM of all of its assets without paying or providing for unsecured debts. Nelsons stood on no different footing than the other unsecured creditors. If a debtor corporation transfers its property without payment or provision for payment of unsecured creditors, equity intervenes and permits the creditors to follow the property except in the case of a good faith transferee for value in the ordinary course of business. The equitable lien is as much available to Nelsons as it is to other unsecured creditors. *See Maytag Co. v. Alward*, 253 Iowa 455, 461, 112 N.W.2d 654, 657 (1962).

■ III. *Disposition.* Nelsons thus had an equitable lien on the assets PBM transferred. Two classes of property may be involved at the time we remand the case: (1) identifiable transferred property which is still owned by Bryant Beef, Inc. or by persons who are not bona fide purchasers for value, and (2) other transferred property. Under their prior judgment for nuisance, Nelsons may, subject to present encumbrances, levy directly on personal property and the feedlot if and to the extent those assets are in the first class. Property of the first class is identifiable and it is in the hands of Bryant Beef, Inc. or persons who are not bona fide purchasers for value; hence Nelsons' equitable lien subsists on that property itself.

As to personal property of the second class, Bryant and Bryant Beef, Inc. have personal liability to the extent of the fair market value of PBM's equity in that second class personalty as of October 2, 1975. Personal property of the second class is either not identifiable or it is in the hands of bona fide purchasers for value; as to such property Nelsons have no equitable lien, but limited personal liability exists on the part of Bryant, who first received the transfer, and Bryant Beef, Inc., his corporation which received the personal property from him. This limited personal liability may be enforced by execution under chapters 626 and 642, The Code of 1979. It does not arise by virtue of any of the four situations listed in *Luedecke*; it comes about

because the transferees took the property subject to Nelsons' equitable lien but the property is no longer available to Nelsons. *Abeken v. United States*, 26 F.Supp. 170, 171 (E.D.Mo.1939); *American Bank v. Port Oxford Cedar Products Co.*, 140 Or. 138, 142–43, 12 P.2d 1014, 1015–16 (1932). *See also* 19 C.J.S. *Corporations* § 1380, at 1098 (1940) ("The transferee's liability extends to, and is limited by, the value of the corporation's assets which come into his hands; and the transferee merely as such is not personally liable, except where the property has been disposed of, misapplied, or converted.").

The feedlot as real property is identifiable but at the time of remand it may be owned by a bona fide purchaser for value; it may thus be in the second class. If the feedlot is in the second class, Nelsons have no lien on it but Bryant Beef, Inc. has limited personal liability, enforceable by execution, to the extent of the fair market value of PBM's equity in the feedlot as of March 4, 1976.

If the amount of PBM's equity in the class-one personalty as of October 2, 1975, exceeds the amount of the equity of Bryant Beef, Inc. in that personalty as of the time Nelsons levy on it, Bryant and Bryant Beef, Inc. have limited personal liability also for the difference in those amounts, enforceable by execution. Likewise, if the feedlot is in the first class and the amount of PBM's equity in it as of March 4, 1976, exceeds the amount of the equity of Bryant Beef, Inc. in the feedlot as of the time Nelsons levy on it, Bryant Beef, Inc. has limited personal liability also for the difference in those amounts, enforceable by execution.

Nelsons' remedies under their equitable lien and under limited personal liability are cumulative; not alternative, but Nelsons may not take altogether more than the lesser of: (1) the unpaid amount of their prior judgment, or (2) the sum of the amounts of PBM's equities in the transferred personalty as of October 2, 1975, and feedlot as of March 4, 1976. This opinion does not adjudicate the fair market value of PBM's transferred personalty on October 2, 1975, or feedlot on March 4, 1976, or the amounts of the encumbrances on those properties on the respective dates.

We direct the district court on motions by any of the parties to conduct hearings, make findings, enter orders, and issue writs to carry out this opinion. *Cf.* § 630.16, The Code of 1979 (analogous auxiliary proceedings). We further direct, in the event non-appearing, additional parties are indispensable to full disposition of motions, that the district court require the movants or opposing parties to bring in the indispensable parties by causing them to be served with original notices. *See* Iowa R.Civ.P. 25(c).

REVERSED AND REMANDED WITH DIRECTIONS.