Frank J. KELLEY, Attorney General of the State of Michigan; and The State of Michigan, Plaintiffs,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation, Inc.; Richard E. Thomas; and Grand Trunk Western Railroad Company, Defendants.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Plaintiff,

v.

Frank J. KELLEY, Attorney General of the State of Michigan; and The State of Michigan, Counter Defendants.

GRAND TRUNK WESTERN RAILROAD COMPANY, Cross Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC

Transportation, Inc.; and Richard E. Thomas, Cross Defendants (Two Cases).

THOMAS SOLVENT COMPANY and Richard Thomas, Counter Plaintiffs,

v.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Defendant (Two Cases).

GRAND TRUNK WESTERN RAILROAD COMPANY, Third–Party Plaintiff,

v.

Richard E. THOMAS, as Trustee of The Richard E. Thomas Living Trust; The Richard E. Thomas Living Trust; and Letha Thomas, Third–Party Defendants (Two Cases).

UNITED STATES of America, Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation Company; Richard E. Thomas, and Grand Trunk Western Railroad Company, Defendants.

Nos. K86–164, K86–167.

United States District Court, W.D. Michigan.

Dec. 2, 1988.

John S. Smietanka, U.S. Atty. by Julie Ann Woods, Asst. U.S. Atty., Grand Rapids, Mich., Joel M. Gross, Steven J. Willey, Environmental Enforcement Section Land and Natural Resources Div. U.S. Dept. of Justice, Washington, D.C., (Roger Grimes, Asst. Regional Counsel, U.S. E.P.A., Chicago, Ill., of counsel), for U.S.

Foster, Swift, Collins & Coey, P.C. by Charles E. Barbieri, John L. Collins, Lansing, Mich., for Thomas Solvent Co. & Richard E. Thomas.

Sullivan, Hamilton & Schulz by James M. Sullivan, Battle Creek, Mich., for Thomas Development, Inc., Thomas Solvent Co. of Detroit, Inc., Thomas Solvent Co. of Muskegon, Inc., Thomas Solvent, Inc. of Indiana & TSC Transp. Co.

Bodman, Longley & Dahling by Fredrick J. Dindoffer, R. Craig Hupp, and Mary P. Sclawy, Detroit, Mich., for Grand Trunk Western R. Co.

Bremer, Wade, Nelson & Alt by Michael D. Wade, Grand Rapids, Mich., for Great American Surplus Lines Ins. Co. Intervening non-party and non-participant.

Frank J. Kelley, Atty. Gen. by Robert P. Reichel, Asst. Atty. Gen., Environmental

Protection Div., Lansing, Mich., for plaintiffs.

## OPINION

ENSLEN, District Judge.

This case is before the Court on the United States and the State's ("plaintiffs") joint motion for summary judgment on their claims for liability under fraudulent conveyance and successor corporation doctrines. Grand Trunk Western Railroad Company, as third-party and cross plaintiff, also moves this Court for an order granting summary judgment in favor of plaintiffs. Opposing the summary judgment motions are: defendant Richard Thomas ("Richard Thomas"), defendant Thomas Solvent Company ("Thomas Solvent Company"), and the four Thomas Solvent spinoff corporations: Thomas Solvent Company of Detroit, Inc. ("Thomas Solvent–Detroit"), Thomas Solvent Company of Muskegon, Inc. ("Thomas Solvent–Muskegon"), Thomas Solvent Inc. of Indiana ("Thomas Solvent–Indiana"), and TSC Transportation Company ("TSC Transportation") (collectively "spinoff corporations"). All six defendants here will be referred to as "defendants".

### Facts

The Court observes the undisputed facts to be as follows. Where there is a dispute as to a specific issue of fact, it will be identified as such.

*The Original Corporation*

Prior to 1982, Thomas Solvent Company was a thriving corporation engaged primarily in the distribution and transportation of industrial solvents. The company operated from two facilities in the Battle Creek, Michigan area, referred to as the "Raymond Road" and "Annex" facilities, as well as from facilities in Ypsilanti and Muskegon, Michigan and Fort Wayne, Indiana. Richard Thomas was the president, a director and, through the Richard E. Thomas Living Trust, the sole shareholder of Thomas Solvent Company. The other directors of the corporation were James Sullivan, the company's lawyer and Letha Thomas, Richard Thomas's mother. As of mid–1981, during the course of negotiations for a potential sale of Thomas Solvent's assets,

Mr. Thomas estimated that the total sale value of those assets was at least $3,500,-000. Deposition of Richard Thomas at 100–109.

*The Contamination of Verona Well Field*

The Verona Well Field is the primary water supply for more than 35,000 people in the Battle Creek area. In the fall of 1981, tests of water samples by the Michigan Department of Public Health ("MDPH") disclosed that the Well Field and a number of private residential wells were contaminated with volatile organic compounds. Subsequent investigations by the Michigan Department of Natural Resources ("MDNR") and the United States Environmental Protection Agency ("EPA") identified the two Thomas Solvent Battle Creek facilities as sources of that groundwater contamination.

Following the initial discovery of contamination in the Battle Creek municipal water supply, the MDPH began extensive periodic testing of samples from individual city wells in the Verona Well Field and numerous private wells in the vicinity. As of September of 1981, ten of the thirty municipal wells were found to be contaminated with volatile organic compounds. The private wells sampled by the MDPH included a well located at the Thomas Solvent Raymond Road Facility. On November 13, 1981, the MDPH wrote Thomas Solvent Company describing the Verona Well Field contamination problem and notifying Thomas Solvent Company that three volatile organic compounds had been detected in its well. Richard Thomas Deposition, at 431–434 (Exh. RT–24).

In late 1981 and early 1982, the MDNR and the EPA Technical Assistance Team ("TAT") began investigating potential sources of groundwater contamination in and around the Verona Well Field. On November 18, 1981, the MDNR collected soil samples at the Thomas Solvent Company Annex facility. In February and March 1982 the initial TAT investigation installed several groundwater monitoring wells in the area.

In January 1982, Richard Thomas received a letter from the MDNR identifying

the two Thomas Solvent Battle Creek facilities as suspected sources of groundwater contamination in and around the Verona Well Field. Richard Thomas Deposition, at 278–280 (Exh. RT–7, RT–25). The MDNR stated that the November 18, 1981 soil samples from the Annex facility were contaminated with volatile organic compounds and that Thomas Solvent Company had stored solvents and wastes at both facilities without adequate containment. The letter directed the company to take a series of steps to investigate and remedy the problem, including: collection and analysis of soil borings, disposal of contaminated soils, performance of hydrogeological study, and implementation of a remedial program for groundwater contamination.

In a January 21, 1982 follow-up meeting with representatives of Thomas Solvent Company, the MDNR told the company that it had been identified as a potential source of groundwater contamination in the Verona Well Field, and reiterated the requests for investigation and clean-up. Deposition of James Sullivan, at 95–100. Thus, by late January 1982, Richard Thomas was aware of the company's potential liability for groundwater contamination. Richard Thomas Deposition, at 278–280, 443–444. During that meeting the MDNR also admitted to investigating Grand Trunk Western Railroad. The MDNR apparently also noted that as recently as 1980, there was no evidence of contamination at the Thomas Solvent Company's site.

In early 1982, Thomas Solvent Company did a number of things related to its potential liability. Richard Thomas wrote a letter to the company's insurer to provide notice that the company was suspected of contributing to the Battle Creek water contamination. James Sullivan Deposition, Exh. JS–5. The company retained a hydrogeological consultant, Robert Minning, and additional legal counsel, John Voepel, from a law firm specializing in environmental law. Robert Minning Deposition, at 13–15 (May 4, 1987), Richard Thomas Deposition, at 283–87, 309; John Voepel Deposition, at 5–8; James Sullivan Deposition, Exhibit JS–7.

In the summer of 1982, Richard Thomas received the laboratory results from its hydrogeological consultant which indicated that contamination was detected on company property. The consultant told Richard Thomas that this contamination in the soil had the potential to migrate into groundwater. Robert Minning Deposition, at 51–52 (May 4, 1987).

Representatives of Thomas Solvent Company met with government officials in July 1982 where the MDNR called Thomas Solvent Company the "number one suspect" in the search for the source of the Battle Creek water contamination. James Sullivan Deposition, Exhibit JS–6; Robert Minning Deposition, at 70–73 (May 4, 1987). The company was also given an EPA report that identified it as an apparent source of the Verona Well Field contamination. Robert Minning Deposition, at 68–70; Richard Thomas Deposition, at 288–289. About this time the EPA added the Verona Well Field site to its national priority list of environmental contamination sites promulgated pursuant to Section 105(8) of CERCLA, 42 U.S.C. § 9605(8) (1983).

In his deposition, Richard Thomas stated that Thomas Solvent Company was concerned about reports, such as the TAT Report, which identified the company as a potential source of contamination, not only because they could be detrimental to business but also because it might have to incur legal expenses and potential liability as a result. Richard Thomas Deposition, at 289. James Sullivan, one of the attorneys then representing Thomas Solvent Company and a director of the corporation, testified at his deposition that prior to July 1982, he anticipated that the MDNR might institute litigation against Thomas Solvent concerning groundwater contamination in Battle Creek, and that he discussed this potential liability with Richard Thomas and John Voepel. James Sullivan Deposition, at 44–46. He considered both government agencies and private individuals as parties potentially asserting environmental claims against Thomas Solvent. *Id.* at 77–79. At this time, the company began to implement plans to reorganize Thomas Solvent. One reason given was the above-mentioned concerns about potential environmental liability. There were also a number of other

reasons supporting reorganization, including flexibility in compensation, tax benefits, better dealings with the union shops, and protection of assets in the event of a future catastrophic accident.

It is against this background that the Thomas Solvent spinoff corporations were formed in July and September, 1982.

*Conveyances of Thomas Solvent Assets to Spinoff Corporation*

In July and September 1982, Thomas Solvent Company substantially reorganized its corporate structure and assets. In summary, the Muskegon, Fort Wayne, and Ypsilanti/Detroit facilities—each of which serviced customers in its area and did so profitably—and the transportation operations, were each separately incorporated, so that the only business operations remaining in Thomas Solvent Company was the Battle Creek operation. John Zuiderveen Deposition, at 80–81. Thomas Solvent–Indiana was incorporated July 13, 1982. Thomas Solvent–Muskegon and Thomas Solvent–Detroit were incorporated on July 23, 1982. TSC Transportation was incorporated on September 29, 1982.

On July 26, 1982, Thomas Solvent Company transferred the majority of its assets to Thomas Solvent–Detroit, Thomas Solvent–Indiana and Thomas Solvent–Muskegon. According to "Special Minutes of the Board of Directors of Thomas Solvent," its Directors, on that date, approved three separate documents, each labeled, "Agreement and Plan of Reorganization." Spinoff Corporations' Answer to Interrogatories, Nos. 3 and 15.

These "Agreements" were executed for both parties by Richard Thomas; once as President of Thomas Solvent Company and once as President of each respective spinoff. Pursuant to those Agreements and Exhibits attached thereto, the assets and retained earnings transferred to, and the liabilities assumed by each of these three spinoffs was valued as follows. Thomas Solvent–Detroit received assets of $1,025,435 and retained earnings of $608,959 while assuming liabilities of $577,377. Thomas Solvent–Muskegon received assets of $348,505 and retained earnings of $174,245 while assuming liabilities of $154,160. Thomas Solvent–Indiana received assets of $443,832 and retained earnings of $281,468 while assuming liabilities of $142,264.

On September 30, 1982, according to Special Minutes of the Board of Directors of Thomas Solvent Company, an Agreement and Plan of Reorganization was approved whereby Thomas Solvent transferred the assets of its transportation business to TSC Transportation. TSC Transportation's Answers to Interrogatories, Nos. 3 and 15. Pursuant to that Agreement and attached exhibits, Thomas Solvent Company conveyed assets valued at $103,748 and retained earnings of $83,648 to TSC Transportation while the only "obligations" assumed by TSC Transportation were those retained earnings and capital stock valued at $20,100.

As a result of these conveyances, the assets and retained earnings of Thomas Solvent were significantly reduced. Richard Thomas Deposition, at 325–326. John Zuiderveen Deposition, at 88, 110. According to Thomas Solvent's federal income tax return for 1982, between December 31, 1981 and December 31, 1982, its total assets dropped from $3,190,053 to $620,842. Further, as a result of the spinoffs, Thomas Solvent Company's retained earnings were reduced by $1,228,719. John Zuiderveen Deposition, at 110 (Exh. 5).

It is undisputed that each of the spinoff corporations received from Thomas Solvent Company assets with value substantially in excess of liabilities each respectively assumed. When initially asked during his deposition what Thomas Solvent Company received in return for the assets that it conveyed to the spinoff corporations, he erroneously suggested that it obtained stock in the spinoff corporations. Richard Thomas Deposition, at 338–339. Subsequent testimony established however that upon the incorporation of Thomas Solvent–Muskegon, Thomas Solvent–Detroit, and TSC Transportation, all of the stock in those entities was directly issued to Richard Thomas as trustee of his Living Trust, and that the stock of Thomas Solvent–Indiana, although initially issued to Thomas Solvent Company, was very shortly

thereafter also transferred to Mr. Thomas's trust. *Id.* at 391, 393–95, 397–98. In sum, the net effect of the July and September 1982 transactions was that the Spinoffs received valuable assets and profitable businesses, the Richard Thomas Living Trust received all the stock of the Spinoffs and Thomas Solvent received nothing of value. *Id.* at 338–340.

Just as Richard Thomas, through his trust, was the sole shareholder in Thomas Solvent Company, he became the sole shareholder in the four spinoff corporations as well. James Sullivan Deposition, at 72. In addition, he is the president, treasurer and a director of each spinoff corporation. Although his mother, Letha Thomas is nominally an officer and director of Thomas Solvent Company and each of the spinoffs, she has been merely a figurehead. She knew nothing of the functioning of the companies and voted at meetings as her son suggested. Letha Thomas Deposition, at 10, 14, 16.

The spinoff corporations continued to operate as substantially the same business in the same manner as the Thomas Solvent branch offices had. The spinoffs in Muskegon, Ypsilanti, and Fort Wayne continued to do business with the former customers of the former Thomas Solvent branch operation. Spinoff Corporations' Answers to Interrogatories Nos. 18, 19(a) and 29(a). They continued to deal in substantially the same products and services as the former Thomas Solvent branch precursors had, and retained substantially the same employees, management, and facilities. *Id.* at Nos. 8, 18, and 19.

*Events Following the Conveyances*

As alleged in the complaints of the United States and the State, plaintiffs have taken a variety of investigative and remedial measures in response to the contamination emanating from the Thomas Solvent Battle Creek Facilities, have already incurred several million dollars of response costs, and are continuing to incur such costs.

In January 1984, as a result of the continuing spread of groundwater contamination from the Thomas Solvent Raymond Road and Annex facilities, the State of Michigan filed a complaint seeking injunctive and monetary relief against Thomas Solvent Company in Calhoun County Circuit Court, *Kelley v. Thomas Solvent Company*, Civ. No. 84–72–CE. After conducting evidentiary hearings in February and March 1984, the state court found that releases of toxic chemicals into soils and groundwater at those facilities violated state law and presented an imminent threat to public health, welfare and natural resources. *See Attorney General v. Thomas Solvent Company*, 146 Mich.App. 55, 380 N.W.2d 53 (1985), *leave denied*, 425 Mich. 880 (1986). The Court ordered Thomas Solvent to immediately take affirmative measures—installation of a groundwater purge and treatment system—to prevent continued migration of contaminants from its Battle Creek facilities. *Id.* Thomas Solvent's own consultant, in response to a court order, submitted a report which estimated that implementation of the preliminary injunctive relief ordered by the court could cost approximately $1,000,000. Robert Minning Deposition, Exhibit 19. The EPA began to study appropriate remedial action in February 1984, and initiated the remedies in May 1984. The remedies included drilling new wells, use of barrier well systems, and use of a carbon air stripper to treat the water.

The Thomas Solvent Company then determined that the costs of compliance with that state court order exceeded its ability to pay and filed a Chapter 11 Bankruptcy petition. Richard Thomas Deposition, at 374–377. In January 1985, the Bankruptcy Court confirmed a plan of liquidation and distribution of Thomas Solvent's remaining assets. Less than $400,000 has been realized from that liquidation of Thomas Solvent Company's assets for distribution to creditors including the United States, the State, and Battle Creek area residents who asserted environmental claims against Thomas Solvent Company.

*Discussion*

*Motion for Summary Judgment*

In considering a motion for summary judgment, the narrow questions presented

to this Court are whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe Inc.*, 668 F.2d 905, 908 (6th Cir.1982).

The moving party has a right to summary judgment where that party is able to demonstrate, prior to trial, that the claims of the plaintiff have no factual basis. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court held in *Celotex*, "... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* 477 U.S. at 317, 106 S.Ct. at 2549, 91 L.Ed.2d at 273. Moreover, the Court must read the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983).

The standard for granting a motion for summary judgment is essentially the same as that for granting a motion for a directed verdict. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party is not entitled to summary judgment where there is sufficient evidence to allow a reasonable jury to return a verdict for the non-moving party. *Id.* 477 U.S. at 260, 106 S.Ct. at 2516, 91 L.Ed.2d at 211–12. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* 477 U.S. at 265, 106 S.Ct. at 2505, 91 L.Ed.2d at 216. Yet summary judgment is appropriate where the opposing party cannot offer evidence to dispute any material fact essential to plaintiff's claim. *Anderson*, 477 U.S. 242, 106 S.Ct. 2505; *Celotex*, 477 U.S. 317,

106 S.Ct. 2548. With this standard in mind, the Court will review the arguments presented by both parties.

*Liability Under Section 566.17*

Plaintiffs argue that Thomas Solvent Company conveyed assets to spinoff corporations with actual intent to hinder, delay, or defraud its creditors, including the United States and the State of Michigan, in violation of the Michigan Fraudulent Conveyance Act ("MFCA" or "Michigan Act"). The MFCA is an adoption of the Uniform Fraudulent Conveyance Act ("UFCA" or "Uniform Act"). The UFCA has been adopted in approximately half the states. The "actual intent" section of the Michigan Act reads in relevant part:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Mich.Comp.Laws Ann. § 566.17 (1967).

To establish a claim under § 566.17 of the Act, plaintiffs must demonstrate four elements: that Thomas Solvent Company is a person under the Michigan Act; that it made a conveyance; that it did so with actual intent to hinder, delay, or defraud creditors; and that plaintiffs are creditors under the Act. Plaintiffs seek summary judgment on their claim under § 566.17.

Defendants have not contested the first two elements of the actual intent section of the Michigan Act, § 566.17. First, as a corporation, Thomas Solvent Company is a person within the meaning of the Act. Though neither the MFCA nor the UFCA provides a statutory definition, other states interpreting the Uniform Act have explicitly so held, or have, without discussion, assumed this element and found corporations to have violated this section of the Uniform Act. *See Montana Ass'n of Credit Management v. Hergert*, 181 Mont. 442, 593 P.2d 1059 (1979); *Locafrance U.S. Corp. v. Interstate Distrib. Services, Inc.*, 6 Ohio St.3d 198, 451 N.E.2d 1222 (1983).

The second element, that Thomas Solvent Company made a conveyance, is likewise

not contested by defendants. Section 566.-11 of the Michigan Act defines "conveyance" as "every payment of money, assignment, release, *transfer*, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance." Mich.Comp.Laws Ann. § 566.11 (1967) (emphasis added). As plaintiffs point out, Thomas Solvent Company transferred approximately $1,205,435 in assets to Thomas Solvent–Detroit, $348,505 to Thomas Solvent–Muskegon, $443,832 to Thomas Solvent–Indiana, and $103,748 to TSC Transportation. Joint Motion of Plaintiffs for Summary Judgment, at 18–19. The agreements and plans of reorganization quite clearly provide for conveyance. Paragraph one of the Agreement and Plan of Reorganization with Thomas Solvent–Muskegon, for example, provided:

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS HEREIN SET FORTH, THE PARTIES AGREE AS FOLLOWS:

1. *Transfers of Properties and Assumption of Liability.* Thomas Solvent Company will sell, assign, transfer and set over to Thomas Solvent Company of Muskegon, Inc. all of the properties, assets, goodwill and business of every kind and description, tangible and intangible, of the Muskegon operations as set forth in Exhibit A hereto. Thomas Solvent Company of Muskegon, Inc. agrees to pay, perform or discharge all debts, liabilities, contracts and obligations of said Muskegon operations, whether accrued, contingent or otherwise, as set forth in Exhibit B hereto.

Defendants Thomas Solvent Company and Richard Thomas's Brief in Opposition to Plaintiffs' Summary Judgment Motion, Exhibit E.

Exhibit A referred to by the Agreement and Plan of Reorganization showed "Assets Transferred to Thomas Solvent Co. of Muskegon." The other agreements between Thomas Solvent Company and the spinoff corporations were similar to the Muskegon Agreement and Plan.

Defendants have contested the third and fourth elements of the claim under § 566.17. Under the third element, plaintiffs must demonstrate that Thomas Solvent Company had actual intent to hinder, delay, or defraud its creditors. Plaintiffs argue that in or around July 1982, Thomas Solvent Company reorganized with the intent to defraud its creditors, including the state and federal governments.

To ascertain the intent of a corporation, it is necessary to look to the intent of its representatives, here Thomas Solvent Company's board of directors, which conceived and authorized Thomas Solvent Company's agreements and plans of reorganization with the spinoff corporations. The directors of Thomas Solvent Company at the time were Richard Thomas, James Sullivan, and Letha Thomas.[1]

Both Richard Thomas and James Sullivan testified that their decision to authorize the conveyances to the spinoffs was motivated by concern about environmental liabilities arising from the Battle Creek groundwater situation. At his deposition, Richard Thomas testified as follows that concern about environmental liability was a factor influencing his decision:

Q. Now, in deciding to separately incorporate the individual branch offices, to what extent, if any, was your concern about potential liability arising from the Verona Well Field contamination a factor?

A. Well, it was in the air. What factor it played, no different than other factors that all went into the decision to separately incorporate.

Q. Was it a factor?

A. It was a factor available to us.

. . . .

Q. Was that a factor that mitigated in favor of the separate corporations?

1. Defendant Richard Thomas is the President, director, and through the Richard E. Thomas Living Trust, the sole shareholder of Thomas Solvent Company. James Sullivan, Thomas Solvent Company's lawyer, and Letha Thomas, Richard Thomas's mother, are the company's other directors. Letha Thomas knew little about the functioning of the company and voted as her son suggested. Letha Thomas Deposition, at 10, 14, 16.

A. Well, I'm sure it would have been, yes.

Q. And how was that?

A. How did the separate corporations help in that manner? Well, the same way it would help with our transportation. We felt if we had an exposure, it would be limited to the corporation that created this exposure.

Richard Thomas Deposition, at 302–303.

James Sullivan, legal counsel and a director of the company, also testified that a reason he voted to create the spinoff corporations was as follows:

There were considerations for the possibility of great losses due to some tort liability, and if, with the separation of the various companies, if one company or another was responsible for a large loss that exceeded insurance limits, the assets of the allied companies would not be involved.

It's pretty hard sitting here today to think of all the things that went into coming to this decision. The fact of a potential environmental loss was a factor that was considered.

. . . .

Q. The last reason you listed was the fact of a potential environmental loss. Were you referring to the environmental situation relating to groundwater contamination in Battle Creek?

A. Any kind of environmental loss. There were problems in Muskegon, I don't think any in Detroit or Indiana at that time.

Q. So when you said fact of potential environmental loss, you included within that the groundwater problems in Battle Creek? Would that be one type or one example?

A. I'm not sure at that time how much we knew about groundwater—I guess we did know. Yeah, that would be.

Q. Would it be fair to say, then, that in your exercising your vote to approve the resolutions one factor that entered into your consideration was concern about potential environmental losses resulting from groundwater contamination in Battle Creek?

A. Yes.

Q. Are you able to quantify in any way the extent to which that was a factor in your consideration?

A. No.

Q. Was it a significant factor?

A. All of the things I mentioned were significant factors.

. . . .

Q. When you refer to potential environmental loss, insofar as that related to groundwater contamination in Battle Creek, would that include the matter of potential liabilities, civil liabilities resulting from the groundwater contamination in Battle Creek?

A. I don't know that I can answer that sitting here today. I think probably it did, but it's hard for me to remember chapter and verse at this point in time.

. . . .

Q. Are you saying that prior to July 1982 there was within Thomas Solvent Company anticipation of litigation that might ensue resulting from the groundwater contamination in Battle Creek?

A. I felt that there was a potential that the Michigan Department of Natural Resources might institute some sort of action.

Q. And you felt that prior to July of 1982?

A. Yes.

James Sullivan Deposition, at 35–37, 45.

Likewise, according to the brief on behalf of the spinoff corporations, deposition testimony disclosed that one reason supporting reorganization was that "[t]he [Thomas Solvent] corporation had been advised that it was a suspected source of contamination of the Verona Wells, and although the extent thereof ... was not known or available, there did exist a potential of liability." Spinoff Corporations' Brief in Opposition to Summary Judgment, at 6–7 (based on deposition testimony of Richard Thomas, James Sullivan, and others).

Plaintiffs, defendants Thomas Solvent Company, Richard Thomas, and the spinoff corporations agree that the directors of Thomas Solvent Company in 1982 feared liability for existing groundwater contam-

ination in the Battle Creek area and let that fear motivate the decision to create the spinoff corporations. All defendants claim, however, that the directors of Thomas Solvent Company had other reasons[2] too for creating the spinoff corporations. Defendants, however, argue that because concern over groundwater contamination in Battle Creek was only one of a myriad of reasons motivating the decision to create the spinoff corporations, defendants did not have "actual intent" under § 566.17 "to hinder, delay or defraud" creditors.

■ The Court believes that § 566.17 does not contemplate liability under the fraudulent conveyance statute only if the intent to hinder, delay, or defraud creditors is the *sole* reason for the conveyance. In *Locafrance U.S. Corp. v. Interstate*, 6 Ohio St.3d 198, 451 N.E.2d 1222, the Ohio court interpreted "actual intent" under the Uniform Act's fraudulent conveyance statute.[3] The court there found actual intent existed where the defendant corporation's decision to "wind down" operations and create two new corporations to carry on the business was "designed, in *part*, to avoid the … judgments against it." *Id.* (emphasis added). Actual intent under the fraudulent conveyance statute exists when a corporation's decision to create one or more new corporations is motivated wholly or in part by a desire to hinder, delay, or defraud creditors.[4] Intent to hinder, delay, or defraud creditors is therefore both a necessary and a sufficient condition for satisfying the actual intent element of the fraudulent conveyance statute, here § 566.17.

■ Thomas Solvent Company and Richard Thomas also argue that there is no liability under § 566.17 because there are disputed facts about whether Thomas Solvent Company had actual intent to defraud its creditors. They protest that the company did not intend to defraud creditors. Thomas Solvent Company and Richard Thomas's Brief in Opposition to Summary Judgment, at 8. All defendants, however, admit that one motive for creating the spinoff corporations was to avoid potential liability related to the groundwater contamination in Battle Creek. Richard Thomas Deposition, at 289, 302–304; James Sullivan Deposition, at 34–36, 45–46, 73–79; Spinoff Corporations' Brief in Opposition to Summary Judgment, at 7. Certainly the company's deliberate effort to put assets out of the reach of creditors meets the standard of intent to defraud. Even if the company only intended to hinder or delay creditors, these purposes satisfy the intent element where a debtor's purpose is merely "to stave off creditors by putting property beyond their reach even when the purpose is not to cheat them of ultimate payment but only to wrest from them time to restore the debtor's affairs." *Klein v. Rossi*, 251 F.Supp. 1, 2 (E.D.N.Y.1966).

The Court concludes that there is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential liability related to existing groundwater contamination in Battle Creek.

2. Testimony from defendant Richard Thomas, James Sullivan, and the company's accountant suggested that they created the spinoff corporations as a means of providing an equity interest in the corporation for branch managers, that there were tax benefits to separating union and non-union shops, and that the separate corporations might do better if each obtained its own insurance. *See* Defendant Spinoff Corporations Brief in Opposition to Motion for Summary Judgment, at 6–7. The company also considered the possibility of future catastrophic accidents handling and transporting its product, and decided that isolating assets would help insulate those assets from future potential judgment creditors. *Id.*

3. Ohio adopted the Uniform Fraudulent Conveyance Act in 1961. *Locafrance,* 6 Ohio St.3d at

198 n. 1, 451 N.E.2d at 1222 n. 1. The Ohio Supreme Court in deciding *Locafrance* was analyzing a statute identical to Michigan's § 566.17. *Id.* at 198, 451 N.W.2d at 1222.

4. In spite of defendants' protests that the company was reorganized for a number of reasons, the Court does not accept the argument that the presence of additional reasons should somehow negate the intent material to § 566.17. The law, whether in intentional tort, murder, burglary, or otherwise has seldom if ever required the intent material to the claim to be the sole intent. It would not be prudent to do so here. If anything, it would allow any defendant to escape liability on the smallest or least significant reason, if it simply existed in addition to the intent material to the claim.

The fourth element necessary for a finding of fraudulent conveyance with actual intent is that plaintiffs are creditors of Thomas Solvent Company for purposes of § 566.17.

The Michigan Fraudulent Conveyance Act defines a creditor as one "having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." Mich.Comp.Laws Ann. § 566.11 (1967). Section 566.17 uses the language *"present or future"* creditors. (emphasis added).

Thomas Solvent Company and Richard Thomas confine their argument on creditor status under § 566.17 to a discussion about whether the state and federal governments were creditors at the time of the conveyances. Thomas Solvent Company and Richard Thomas's Brief in Opposition to Summary Judgment, at 9–10 (citing *Wright v. Brown*, 317 Mich. 561, 27 N.W.2d 97 (1947) ("look at the circumstances at the time of the conveyance")).

Defendants do not assert that the state and federal government are not now creditors of Thomas Solvent Company. Given the express "present or future" directive of § 566.17, it seems clear that the state and federal governments are creditors for the purpose of § 566.17.

Also, the governments are seeking millions of dollars in claims for remedial cleanup costs under CERCLA § 107, 42 U.S.C. § 9607 (1983). Given courts' broad application of § 566.11, Thomas Solvent Company's liability for response costs incurred by the plaintiffs in connection with contamination of the Verona Well Field clearly constitutes a "debt" owed to the plaintiffs, its "creditors." *See, e.g., Churchill v. Palmer*, 57 Mich.App. 210, 226 N.W.2d 60 (1974) (wrongful death claimant); *Ashbaugh v. Sauer*, 268 Mich. 467, 256 N.W. 486 (1934); *Iden v. Huber*, 259 Mich. 3, 242 N.W. 818 (1932) (tort claimant).

■ The State and the United States have been "creditors" of Thomas Solvent Company within the meaning of the MFCA, since at least late 1981 and early 1982, respectively, when they began to incur response costs and damages in connection with the contamination of groundwater in and around the Verona Well Field. As discussed above, the MDPH began extensive sampling and analysis of water supplies in the fall of 1981. The MDNR and the EPA, through its TAT contractor, Ecology and Environment, conducted investigations of the extent and potential sources of contamination beginning in late 1981 and early 1982. Having incurred these and other response costs, both the United States and the State were creditors of Thomas Solvent Company at the time of the conveyances to the spinoff corporations.

In sum, the Court finds that each of the four necessary elements under § 566.17 has been established by plaintiffs. Defendants have not produced evidence to dispute any fact that is material to plaintiffs' claim. Accordingly, the Court will grant the plaintiffs' motion for summary judgment on the fraudulent conveyance claim under § 566.17.

*Liability under Section 566.14*

Because the Court is granting summary judgment for plaintiffs on the "actual intent" statute, § 566.17, it need not consider liability under the "constructive fraud" statute, § 566.14. Unlike this case, where actual evidence of intent is *not* available, courts may infer fraudulent intent from the circumstances surrounding the conveyance. Circumstances that are suspect and often accompany an intent to hinder, delay, or defraud creditors are termed "badges of fraud." *See, e.g., Bentley v. Caille*, 289 Mich. 74, 286 N.W. 163 (1939) (interpreting an earlier Michigan statute identical to § 566.14). *See also Montana Nat'l Bank v. Michels*, 631 P.2d 1260 (Mont.1981). In *Bentley v. Caille*, 289 Mich. 74, 286 N.W. 163, the court stated:

Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case, and may be overcome by evidence establishing the *bona fides* of the transaction. However, a concurrence of several badges will always make out a strong case.

*Id.* (quoting *Timmer v. Pietrzyk*, 272 Mich. 238, 261 N.W. 313 (1935)).

The Court observes that courts often recognize the following as indicative of actual fraud, or as otherwise termed, badges of fraud: lack of consideration for the conveyance, a close relationship between transferor and transferee, pendency or threat of litigation, financial difficulties of the transferor, and retention of the possession, control, or benefit of the property by the transferor. *United States v. Vertac Chemical Corp.*, 671 F.Supp. 595 (E.D.Ark. 1988); *Montana*, 631 P.2d 1260; *Bentley*, 289 Mich. 74, 286 N.W. 163. A cursory inspection suggests that the Court could well find that an inference of actual fraud can be derived from the presence of undisputed facts here.

*Successor Liability*

Plaintiffs also move for summary judgment under a theory of successor liability. They argue that based on undisputed facts, the spinoff corporations are corporate successors under federal and state interpretations of successor liability.

 Generally, when a corporation sells all its assets to another corporation, the sale does not bring with it the liquidated and unliquidated debts, claims, or liabilities of the selling corporation. *See, e.g., Trujillo v. Longhorn Mfg. Co.*, 694 F.2d 221, 225 (10th Cir.1982); *Pelc v. Bendix Machine Tool Corp.*, 111 Mich.App. 343, 351, 314 N.W.2d 614 (1981). There are four well-known exceptions where a corporation that purchases assets of another corporation will succeed to its liabilities:

(1) when the purchasing corporation expressly or implicitly agreed to assume the seller's liabilities;

(2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations;

(3) when the purchaser corporation is merely a continuation of the seller corporation; [or]

(4) when the transaction is fraudulent.

*Conn v. Fales Div. of Mathewson Corp.*, 835 F.2d 145, 146 (6th Cir.1987); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). *Accord Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir.1985); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 692 (1st Cir.1984); *Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Ass'n, Inc.*, 437 F.Supp. 1083, 1089–90 (D.Mass.1977); *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 417 n. 3, 244 N.W.2d 873 (1976); *Pelc*, 111 Mich.App. at 351–52, 314 N.W.2d 614. *See Wood v. International Brotherhood of Teamsters*, 807 F.2d 493 (6th Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). The general rule and its exceptions are accepted in the majority of jurisdictions. *Bud Antle, Inc.*, 758 F.2d at 1456; *Dayton*, 739 F.2d at 692; *Parra v. Production Machine Co.*, 611 F.Supp. 221, 223 n. 1 (E.D.N.Y.1985).

In cases where the underlying action sounds in federal law, courts have also fashioned relief for claimants under the law of successor liability.[5] *Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1289 (8th Cir. 1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984) (patent law); *Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221, 224–225 (10th Cir.1982) (Title VII case); *Atlas Tool Co. v. Comm. of Internal Revenue*, 614 F.2d 860, 870 (3rd Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980) (IRS case); *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327 (9th Cir.1975) (labor dispute); *Goldstein v. Gardner*, 444 F.Supp. 581, 583 (N.D.Ill.1978) (securities law); *Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834 (S.D.N.Y.1977) (securities law).

 The Court is convinced that the strongest argument for finding successor liability under the facts before it is under the third exception, the "mere continua-

**5.** The Court believes that the use of a doctrine of successor liability to pursue a remedy under CERCLA should be decided, where possible, by uniform federal rules. *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). Here that entails using traditional principles of corpo-

rate successorship identified under Michigan law and the majority of jurisdictions and using those principles in the context of a federal remedial statute designed to protect an important federal interest, the abatement of toxic waste

tion" doctrine.[6] Under this doctrine, courts have used a number of factors to analyze whether "the purchasing corporation is simply a 'new hat' for the seller." *Bud Antle v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir.1985) (quoting *McKee v. Harris–Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98, 106 (1970). If the new corporation is simply a continuation of the old one, a claimant may successfully pursue the new corporation for satisfaction of a debt or judgment. *Id.*

In an environmental liability case that applied the "mere continuation" doctrine to hold the new corporation liable to creditors of the original corporation, the court relied on the following indicia of "mere continuation." *U.S. v. Vertac Chemical Corp.*, 671 F.Supp. 595 (E.D.Ark.1987). First, the court noted that the same entity owned 100% of both the original and the new corporation at the time the assets were conveyed. *Id.* at 615. In addition, the court found a continuity of officers and directors between the original and the new corporation. The court also observed similarities in staff, products marketed, customers, and use of trade names. *Id.*

The oft-cited factors identified by the Eighth Circuit in *Tucker v. Paxson Machine Co.*, 645 F.2d 620 (8th Cir.1981), and used to establish successor liability under the "mere continuation" doctrine are: a common identity of officers, directors, and stockholders between the selling and purchasing corporations. *See also Bud Antle, Inc.*, 758 F.2d at 1458–59; *Wood*, 758 F.2d at 1458–59; *Dayton*, 739 F.2d at 693; *Atlas*, 614 F.2d at 871; *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir.1977).

Thomas Solvent Company and Richard Thomas attempt to distinguish the facts of the instant case by pointing out that Thomas Solvent Company maintained its corporate identity in Battle Creek. They also argue that each new spinoff corporation performed discreet functions and was located in a separate geographical area. As plaintiffs point out, these facts are immate-

rial as they distinguish the spinoffs from each other rather than from Thomas Solvent Company, their originator. Also, focusing on these facts avoids the three factor test enunciated in *Tucker v. Paxson* and its progeny.

I note that each of the three factors that the Eighth Circuit found vital to establish "mere continuation" is found in the undisputed facts before me. There is a continuity of shareholders. The Richard Thomas Trust owns 100% of Thomas Solvent Company's stock and 100% of each of the spinoff corporation's stock. James Sullivan Deposition, at 72. There is a continuity of directors. Richard Thomas was a director of Thomas Solvent Company along with his mother and his lawyer. He is a director of each of the spinoffs, along with his mother. Letha Thomas Deposition, at 10, 14, 16; Spinoff Corporations' Answers to Interrogatory No. 6. There is a continuity of officers. Richard Thomas was president of Thomas Solvent Company and is President of each of the spinoff corporations.

As in *U.S. v. Vertac*, the facts here demonstrate a number of other striking similarities between the original and the new corporate entities. There was, for example, continuity of staff. After the formation of the spinoff corporations, Richard Thomas still managed from his Battle Creek office, generally maintaining a routine indistinguishable from the one before the spinoffs were created. Donna Kodis Deposition, at 128–31. The Muskegon, Ypsilanti, and Fort Wayne spinoff corporations retained substantially the same employees. The spinoff corporations operated substantially the same business in products and services as had Thomas Solvent Company. Spinoff Corporations' Answers to Interrogatories, No. 8, 18, 19. The Muskegon, Ypsilanti, and Fort Wayne spinoff corporations continued to do business with the former customers of Thomas Solvent Company's branch operation. Spinoff Corporations' Answers to Interrogatories, No. 18, 19(a), 20(a). When the Thomas Solvent Company ceased operations in 1984, some employees were transferred to the payroll of Thomas

hazards. *See United States v. A & F Materials, Inc.*, 578 F.Supp. 1249, 1255 (S.D.Ill.1984).

6. The Court will therefore not address the fourth exception and potential basis for finding successor liability here, that of fraud in the transaction.

Solvent–Muskegon and continued to service former Battle Creek customers. Doralee Southern Deposition, at 26–28.

The policy reasons supporting the doctrine of successor liability militate in favor of applying the doctrine where the traditional standards for "mere continuation" are met and where there are unpaid liabilities for environmental damage left with a corporate shell quite unable to make restitution.

The historical basis for imposing successor liability is founded upon principles of equity that seek to prevent creditors of the original corporation from being left without a remedy while the corporation escapes responsibility by transferring its assets into a new form. There is no reason why a corporation should escape liability for costs that their pollution imposes on society. Where federal law assigns responsibility for restitution costs, principles of equity support leaving a remedy available for the government on behalf of society.

The Court also believes that the equities favor successor liability here, as in other successor liability contexts, because it is the successor corporations who have benefited from any polluting practices of their predecessor. *See E.E.O.C. v. MacMillian Bloedel Containers, Inc.*, 503 F.3d 1086, 1092 (6th Cir.1974); *Trujillo*, 694 F.2d at 225.

In addition, applying the successor liability doctrine to prevent shrinking the area of potential liability is a practice that is in accord with the practice of courts that have interpreted CERCLA actions broadly in favor of the government. Comment, *Developments in the Law—Toxic Waste Litigation*, 99 Harv.L.Rev. 1458, 1513–14 (1986). Although this may ostensibly appear harsh, broader liability here is desirable because it shifts remedial cleanup costs to the parties responsible for creating the hazard; it creates incentives for safer practices; and it encourages defendants to locate and implead other responsible parties. *Id.* at 1513.

### Conclusion

To sum, the Court grants the plaintiffs' and Grand Trunk Western Railroad's mo-

tions for summary judgment in favor of plaintiffs on the fraudulent conveyance claim under Mich.Comp.Laws Ann. § 566.17. Because liability is established under § 566.17, the "actual intent" statute, I need not reach the "constructive intent" liability issue under Mich.Comp.Laws Ann. § 566.14. The Court also grants plaintiffs' and Grand Trunk Western Railroad's motions for summary judgment on the issue of successor liability.

The Court will decide the issue of potential remedies after the parties have submitted supplemental briefs on this issue. These briefs should address the appropriateness of various remedies as set forth by the Michigan Fraudulent Conveyance Act and under a successor liability claim.