**BUD ANTLE, INC., Plaintiff-Appellee,**

v.

**EASTERN FOODS, INC.,
Defendant-Appellant.**

**No. 84-8106.**

United States Court of Appeals,
Eleventh Circuit.

April 25, 1985.

Rehearing and Rehearing En Banc
Denied June 5, 1985.

See also D.C., 567 F.Supp. 445.

William A. Trotter, III, Augusta, Ga., Paul R. Jordan, Atlanta, Ga., for defendant-appellant.

F. Barron Grier, III, Charles Carpenter, Jr., Columbia, S.C., for plaintiff-appellee.

Before VANCE and ANDERSON, Circuit Judges, and PITTMAN *, District Judge.

PITTMAN, District Judge.

The appellant, Eastern Foods, Inc. (Eastern), appeals from a jury verdict in which it was held liable under the theory of de facto merger for a debt on open account owed by B & B Produce Processors, Inc. (B & B) to the plaintiff-appellee Bud Antle, Inc. (Bud Antle). Eastern contends that the district court erred in its refusal to direct a verdict

in its favor on the de facto merger count and in its charge to the jury on the de facto merger doctrine. This court agrees and must reverse the district court's judgment.

I. *Factual Background*

The plaintiff-appellee Bud Antle, which is in the wholesale produce business, sold lettuce on open account to B & B. B & B processed and packaged the lettuce and sold it to its customers, principally fast food franchises. B & B experienced cash flow problems, and by September 30, 1978, it owed Bud Antle $158,659.57 on open account.

During September, 1978, the defendant-appellant Eastern, a corporation that produces, sells, and distributes food products, met with B & B and showed interest in a possible merger with B & B. Eastern, B & B, and B & B's shareholders on September 29, 1978 entered an "Option Agreement" under which Eastern paid B & B $50,000.00 for "the option to purchase all of the business and affairs of B & B." The agreement provided:

> If such option is exercised then at Eastern's election, either the Shareholders [of B & B] will transfer to Eastern all of the issued and outstanding stock of B & B or B & B will transfer all of its assets, real, personal, tangible and intangible to Eastern which at closing shall assume all of the disclosed liabilities of B & B. The exercise price under such option shall be a total of $50,000 payable at closing.

Contemporaneously with the execution of this option agreement, Eastern and B & B entered into a "Management Agreement" which gave Eastern certain authority to manage the operations of B & B. The purported purpose of this arrangement was to give Eastern an opportunity to evaluate in detail the financial condition of B & B and thus enable Eastern to reach an informed decision about whether to exercise its option. On October 1, 1978, Eastern and B & B entered a more comprehensive

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by

designation.

"Restated Management Agreement" which gave Eastern greater control over the management of B & B. This agreement provided that Eastern "shall be the exclusive manager of [B & B's] business, and hereby agrees to provide such services and perform such duties as are customarily provided for in such instances." It provided that Eastern agreed "to advise, consult with, and issue directions" on a variety of matters including all sales activities; the hiring, paying, and discharging of B & B's employees; the ordering of inventory and supplies; the conducting of promotional activities; and the maintenance of all machinery, fixtures, vehicles, and other operating equipment. The agreement authorized Eastern to place any or all B & B employees on Eastern's payroll. It authorized Eastern to terminate or renegotiate B & B's equipment rental contracts and leases. It authorized Eastern, where feasible, to consolidate the two companies' existing branch facilities. It authorized Eastern to negotiate with B & B's creditors to obtain voluntary reductions of B & B's outstanding debt. The agreement stated that Eastern would provide these services as an independent contractor, and it provided for Eastern to be compensated for the services based on the volume of B & B's production and sales during the operation of the agreement.

Pursuant to this agreement, Eastern undertook the management and operation of B & B from October 1, 1978 to February 29, 1979. It instituted a number of management actions authorized by the agreement. It loaned money to B & B without interest, receiving in return promissory notes executed by B & B and personally guaranteed by two of B & B's officers. Eastern renegotiated several of B & B's leases which were in default. It consolidated five of the two companies' branch warehouse facilities. There was no separate accounting by either B & B or Eastern for the cost or rent associated with the joint use of the other's offices and warehouses. Eastern also assumed the responsibility of making B & B's payroll, and the employees

of B & B were paid by checks drawn on Eastern's account.

Since the management agreement provided that all funds derived from the operation of B & B would be received by Eastern, Eastern established a separate bank account for B & B. This account was entitled "Bell and Brook Account." Eastern used the name "Bell & Brook" in place of "B & B" on invoices and stationery. The Bell & Brook invoices listed the products sold by B & B as well as certain products sold by Eastern. Each product was identified by a unique product code number which enabled Eastern to keep separate records for the sale of B & B products and the receivables they generated. The name "Bell & Brook" allegedly was used in place of "B & B" to distinguish the sales, receipts, and expenses that B & B generated prior to the management agreement from those it generated after the agreement. Most of B & B's receivables generated prior to the signing of the management agreement had been sold to a factoring company.

During this period Eastern advised B & B's creditors, including Bud Antle, that Eastern and B & B had entered into a management agreement and option agreement and that the two corporations were considering a merger. Eastern also sought to ascertain from B & B's creditors the outstanding balances on B & B's accounts. Eastern, B & B, and Bud Antle engaged in a series of discussions and communications concerning B & B's outstanding debt and the possible merger. Eastern attempted to persuade Bud Antle to accept a reduction in B & B's debt, but Bud Antle insisted on full payment.

During the operation of the Restated Management Agreement, Eastern purchased produce from Bud Antle. All of these purchases were invoiced to Eastern even though some of the shipments were made to B & B at various warehouse locations. Eastern paid Bud Antle for all of the produce it purchased. During the term of the Restated Management Agreement,

Bud Antle made no sales of lettuce directly to B & B.

Eastern terminated the Restated Management Agreement in February of 1979 as the agreement provided it could do. Eastern ceased doing business with B & B's customers and notified them that its management relationship with B & B had been terminated. There was conflicting testimony about whether Eastern retained any of B & B's assets after terminating the agreement. It is clear that most of B & B's assets were seized by creditors and state taxing authorities.

It is undisputed that there was no statutory merger between Eastern and B & B. There was never a transfer of the capital stock of one corporation to the other corporation or its shareholders, officers, or directors. No shareholder, officer, or director of either corporation ever became a shareholder, officer, or director of the other.

## II. *Proceedings Below*

Bud Antle filed suit against Eastern to recover the unsecured open account indebtedness of B & B. Bud Antle's complaint included several counts, but only two remained when the case came to trial. Count One alleged that Eastern had defrauded Bud Antle. Count Two alleged that a de facto merger had occurred between B & B and Eastern, making Eastern liable for B & B's debts. At the close of the plaintiff's evidence, Eastern moved for a directed verdict on both counts. The district court granted Eastern's motion on the fraud count but denied it on the de facto merger count. At the conclusion of all the evidence, Eastern renewed its motion for a directed verdict on Count Two. The district court decided that there was sufficient evidence of a de facto merger to submit the case to the jury, and it denied the motion.

The court submitted the case to the jury, instructing them in relevant part as follows:

You should sift the evidence and determine ... whether the Plaintiff has proven the following essential elements of the claim against the Defendant....

First, that B & B Produce Processors, Inc., was indebted to Bud Antle, Inc., in some amount of money. Second, that B & B Produce Processors, Inc., merged with Eastern Foods, Inc. There is no dispute about the amount of debt which is owed by B & B Produce Processors, Inc., to Bud Antle, Inc. Accordingly the main question to which you must direct yourselves is that of merger. Has the Plaintiff proven by a preponderance of the evidence that the two corporations, Eastern Foods, Inc., and B & B Produce Processors, Inc., have merged, joined or combined their ownership or business affairs so that the two have become one and the surviving corporation is liable for the debts of both corporations....

... A company to which assets or property is transferred by whatever means is not ordinarily liable for the debts of the former owner of the assets or property. Some exceptions to this rule obtain when A, there is an express or implied assumption of liability, B, the transaction is fraudulent, C, the transfer is not entirely in good faith, or D, the company acquiring the assets or property is a mere continuation of the old corporation. To guide you in any determination of whether one of the companies involved in this case is a mere continuation of the old corporation you may consider what's called a laundry list of factors, which I have labeled A through K, which I'll give you to consider on the question of merger generally.

\*        \*        \*        \*        \*        \*

Now, getting to that laundry list that I told you about. In determining whether or not one corporation merged with or became a part of or was absorbed by another corporation you may consider such things as whether one company acquired substantially all or a major part of the assets or property of the other, and the consideration, money or benefit paid for such transfer of assets if any; whether there was a system of account-

ing of property control by which the assets of one company could be traced as separate from the other; whether the accounts of one company's payable, receivables or both were mixed or confused with, or segregated from those of the other company; whether the alleged acquiring company dealt with the customers, suppliers and employees of the other company as those of its own or as those of a separate company; whether the alleged acquiring company kept separate accounts of its expenses in dealing with or in the affairs of the other company, or simply spent its money as if dealing with or in its own affairs; whether representations, statements or appearances to the trade or the public were consistent with those of separate companies or one company; whether the general operation of the business of the two corporations was as if there were two separate businesses, or a single business unit; whether or not the business affairs of one company became so comingled, confused or mixed with that of the other company so that the operation of the one was indistinguishable from that of the other; and, whether or not the shareholders of either of the corporations involved, or either company itself received any sort of transfer of or interest in, the corporate shares, stock or units of ownership of the other company; whether, during the course of their mutual dealings, there were changes in the management of one or both of the corporations so that some commality [sic] of the directors, officers, or management of the companies developed; or other similar factors.

The jury returned a general verdict in favor of Bud Antle, and the district court entered a judgment accordingly for the sum of $158,659.57, plus interest and costs. Eastern appealed.

### III. The Issues on Appeal

Eastern raises three issues in its appeal. First, it contends that the district court erred in refusing to direct a verdict in its favor on the issue of de facto merger because there was no evidence of (1) an assumption by Eastern of B & B's pre-existing debts; (2) a transfer of B & B's assets to Eastern; (3) a statutory merger between Eastern and B & B; (4) fraud; (5) a transfer of B & B's capital stock to Eastern; or (6) a commonality or a continuity of officers, directors, and shareholders between B & B and Eastern. Second, Eastern contends that the district court erred in its charge to the jury on the law of de facto merger by instructing the jury that in determining whether a merger occurred it could consider—singularly and in the disjunctive—a "laundry list of factors" which did not require a finding of (a) a transfer of assets from B & B to Eastern, (b) a continuity of shareholders, and (c) a commonality of officers, directors, and shareholders. In the absence of these elements, Eastern argues, there cannot, as a matter of law, be a de facto merger. Last, Eastern contends that the district court erroneously failed to charge the jury on the proper measure of damages.

### IV. Corporate Liability for the Debts of a Predecessor

As a general rule, a corporation that purchases or otherwise acquires the assets of a second corporation does not assume the debts and liabilities of the second corporation. *Kemos, Inc. v. Bader,* 545 F.2d 913, 915 (5th Cir.1977); *accord Carswell v. National Exchange Bank of Augusta,* 165 Ga. 351, 140 S.E. 755 (1927). Most jurisdictions recognize four exceptions to this rule, however, and will hold the buying corporation liable for the seller's debts if (1) the buyer expressly or impliedly agreed to assume such debts; or (2) the transaction amounts to a de facto merger of the buyer and seller; or (3) the buying corporation is a "mere continuation" of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts. *Acheson v. Falstaff Brewing Corp.,* 523 F.2d 1327, 1329–30 (9th Cir. 1975). *See, e.g., Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977); *Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 838 (S.D.N.Y.1977); *McKee v.*

*Harris-Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98, 101–02 (Law Div.1970), *aff'd* 118 N.J.Super. 480, 288 A.2d 585 (App.Div. 1972). Another exception, which courts often incorporate into one of the previous four, to-wit: the fraudulent transaction exception, is the absence of adequate consideration for the sale or transfer. *McKee,* 264 A.2d at 102. Although Georgia courts have not expressly adopted all of these exceptions, early Georgia cases indicate agreement with the majority rule. *See Carswell,* 140 S.E. at 758.

All four of these exceptions require a transfer of assets in order to hold the acquiring corporation liable. The existence of such a transfer is a disputed issue of fact in this case; and under the trial court's instructions to the jury, it cannot be determined whether the jury found such a transfer to have occurred. There was evidence from which the jury might have found such a transfer to have taken place *during* the operation of the management agreement. The jury might have found that Eastern controlled B & B's assets and used them for its own operations. There was also some testimony that Eastern retained some of B & B's assets after the management agreement was terminated. Assuming that Eastern's control and retention of such assets was sufficient to raise a jury question on the issue of transfer of assets, Eastern's contention that the district court should have directed a verdict in its favor on this issue would be without merit.

Even with that assumption, Eastern can be held liable for B & B's pre-existing debts only if Bud Antle has proven the applicability of one of the exceptions listed above. Bud Antle did not raise in its complaint all of the exceptions. Only the fraud and de facto merger exceptions were raised expressly in independent counts, and only the de facto merger exception reached the jury. The exceptions for fraud and the express or implied assumption of debts, therefore, are not before this court.

The trial court's instructions to the jury appear to combine the de facto merger and mere continuation exceptions. The trial court listed the four exceptions to the general rule as follows:

A, there is an express or implied assumption of liability, B, the transaction is fraudulent, C, the transfer is not entirely in good faith, or D, the company acquiring the assets or property is a mere continuation of the old corporation.

The district court did not expressly include the de facto merger exception in this list, but it referred to the merger issue as the main question for the jury to decide. After listing the four exceptions, the court told the jury that it should consider a laundry list of factors in determining "whether one of the companies involved in this case is a mere continuation of the old corporation." When the court then recited the list of factors to the jury, it told them to consider the factors "[i]n determining whether or not one corporation merged with or became a part of or was absorbed by another corporation." Although the de facto merger and mere continuation exceptions are related and have similar characteristics, most courts have treated them as separate theories. *See, e.g., Travis,* 565 F.2d at 446–47; *Armour-Dial, Inc. v. Alkar Engineering Corp.,* 469 F.Supp. 1198, 1201 (E.D.Wisc. 1979); *McKee,* 264 A.2d at 101–06. This court will address them separately as well.

### 1. De Facto Merger

Although the Georgia courts have not recently addressed the concept of de facto merger, Georgia likely would follow the majority view concerning the requirements and applicability of the de facto merger doctrine. The Eighth Circuit recently set out the elements that must be present to find a de facto merger:

(1) There is continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the

shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Keller v. Clark Equipment Co.,* 715 F.2d 1280, 1291 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984).

▮ It is undisputed that one of these four elements was not present in this case: a continuity of shareholders resulting from the acquiring corporation paying for the acquired assets with shares of its own stock. Several courts have held that "[a] consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities." *Good v. Lackawanna Leather Co.,* 96 N.J.Super. 439, 233 A.2d 201, 208 (Ch.Div.1967). *See, e.g., Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir.1977); *Travis v. Harris Corp.,* 565 F.2d 443 (7th Cir.1977).[1] At the very least, there must be some sort of continuation of the stockholders' ownership interests. *See Atlas Tool Co., Inc. v. C.I.R.,* 614 F.2d 860, 871 (3d Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). The reason for this requirement is that corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself. *Fehl v. S.W.C. Corp.,* 433 F.Supp. 939, 945 (D.Del.1977). The corporate entity and its shareholders ultimately are respon-

sible for the disposition of the corporation's assets and the payment of its debts. *Travis,* 565 F.2d at 447. Even if the corporation sells to another corporation its entire business operation and all its assets, in exchange for some consideration other than stock, the two corporate entities remain distinct and intact. The corporate entities have not merged, and each is liable for its own debts, absent fraud or one of the other exceptions listed above.

> Where the assets are sold for cash [rather than stock], no basic fundamental change occurs in the relationship of the stockholders to their respective corporations, ... and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale.

*Id.* (citations omitted).

In the case at bar, the evidence was undisputed that no transfer of stock took place. Therefore, there could not have been a de facto merger to make Eastern liable for B & B's debts. The district court should have directed a verdict in Eastern's favor on the issue of de facto merger.

### 2. The "Mere Continuation" Exception

▮ The mere continuation exception applies when the purchasing corporation is merely a continuation or reincarnation of the selling corporation. *Armour-Dial, Inc.,* 469 F.Supp. at 1201. In other words, the purchasing corporation is merely a "new hat" for the seller, with the same or similar management and ownership. *McKee,* 264 A.2d at 106. In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the seller—not whether there is a continuation of the seller's business operation. *Travis,* 565 F.2d at 447. Therefore, "[t]he key

---

1. Some courts, applying the de facto merger doctrine to products liability cases, have modified the requirements for finding a de facto merger. The Supreme Court of Michigan has distinguished the doctrine's application in products liability cases. *See Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). In a very recent opinion, the Fifth Cir-

cuit similarly modified the mere continuation exception. *See Mozingo v. Correct Manufacturing Corp.,* 752 F.2d 168 (5th Cir.1985). *But see Weaver v. Nash International, Inc.,* 730 F.2d 547, 548 (8th Cir.1984); *Travis,* 565 F.2d at 447 & n. 6. Since the modification was carved out for products liability cases, it has no application here.

1459

element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations." *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 440 (7th Cir.1977). *But see Rivers v. Stihl, Inc.,* 434 So.2d 766, 771–72 (Ala.1983) (applies a "basic continuity of enterprise" test in the context of products liability).

The evidence was undisputed that there was no such continuation of management or ownership in the case at bar. None of B & B's officers, directors, or stockholders ever became an officer, director, or stockholder of Eastern. Although some of B & B's officers may have been employed by Eastern, mere employment is insufficient to warrant application of the continuation exception. *See Travis,* 565 F.2d at 447 (discussing *Lopata v. Bemis Co., Inc.,* 383 F.Supp. 342 (E.D.Pa.1974), *vacated* 517 F.2d 1398 (3d Cir.), *on remand* 406 F.Supp. 521 (E.D.Pa.1975)). Therefore, Eastern was not, as a matter of law, a continuation of B & B, and the district court should have directed a verdict in Eastern's favor on this issue.

## V. *Conclusion*

Since the district court erred in failing to direct a verdict in Eastern's favor, this court must reverse the judgment of the district court. This court need not reach Eastern's other arguments concerning the district court's instructions to the jury. The foregoing discussion of the de facto merger doctrine clearly indicates that the jury charge erroneously permitted the jury to find a de facto merger in the absence of certain essential elements. This court does not reach the issue of the proper measure of damages.

For the foregoing reasons, the judgment of the district court is REVERSED and judgment rendered in favor of the defendant-appellant Eastern Foods, Inc.

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by