32 F.3d 1277
 GRAND LABORATORIES, INC., Appellee,
v.
MIDCON LABS OF IOWA, Barco Laboratories, Inc.; Midcon Labs,
Inc., a Missouri corporation; Barco Laboratories of Iowa,
Inc., an Iowa corporation; Kansas City Southern Industries,
Inc., a Delaware corporation; PVI, Inc., a Missouri
corporation; Central Biomedia, Inc., a Missouri
corporation, Appellants.
GRAND LABORATORIES, INC., Appellee,
v.
MIDCON LABS OF IOWA, INC.; Barco Laboratories, Inc., Defendants,
Midcon Labs, Inc., a Missouri corporation, Appellant,
Barco Laboratories of Iowa, Inc., an Iowa corporation, Defendant,
Kansas City Southern Industries, Inc., a Delaware
corporation, Appellant,
PVI, Inc., a Missouri corporation; Central Biomedia, Inc.,
a Missouri corporation, Defendants.
 Nos. 93-3165, 94-1573.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 11, 1994.
Decided Aug. 17, 1994.
 
 Robert B. Best, Jr., Kansas City, MO, argued (John K. Power, on the brief), for appellants.
 George T. Qualley, Sioux City, IA, argued, for appellee.
 Before MAGILL, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and LOKEN, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Defendants Kansas City Southern Industries, Inc. (KCSI) and its subsidiary Midcon Labs, Inc. (Midcon) appeal the district court's judgment awarding plaintiff Grand Laboratories, Inc. (Grand) compensatory and punitive damages in this diversity case. A jury found that Midcon was liable as a successor corporation for a default judgment of $1,785,380 entered for Grand and against Mid-Continent Biological Laboratories, Inc. in 1986, that KCSI was liable for the same amount under a "piercing the corporate veil" theory, and that KCSI was liable for $6,400,000 in punitive damages. Defendants argue that there was insufficient evidence to support a finding of Midcon's successor liability under Iowa law and that the district court erred in submitting the question of punitive damages to the jury. We reverse.
 
 I. BACKGROUND
 
 2
 Grand is a South Dakota corporation that develops, produces, and markets veterinary biological products. Dr. Duane C. Pankratz (Pankratz) is Grand's sole shareholder. KCSI is a publicly-traded holding company located in Kansas City, Missouri, that owns various subsidiary companies. Midcon was a wholly-owned subsidiary of PVI, Inc., which in turn was a wholly-owned subsidiary of KCSI. Midcon was incorporated in 1984 for the purpose of developing, producing, and selling veterinary biological products, but ceased all operations in 1988.
 
 
 3
 Pankratz, who has a background in veterinary medicine and animal pathology, began developing veterinary biological products in the late 1960s. He formed Grand and, in the early 1970s, hired Patrick Graham to assist in the company's production efforts. In 1978, Grand decided to broaden its marketing efforts by licensing a company to produce and sell its products on a royalty basis. The licensee, Grand Laboratories of Missouri (Grand of Missouri), received permission to use Grand's trade secrets in producing veterinary biological products. Grand provided Grand of Missouri with product outlines[1] and other materials needed to make product; in exchange, Grand received a percentage of Grand of Missouri's net profits and a royalty based on the number of bottles of product sold. Grand of Missouri operated on a farm owned by Gary Buffington, who was a part owner and managing officer of the company. Graham was also a part owner of Grand of Missouri, as was Buffington's brother, Virgil.
 
 
 4
 In 1979, Pankratz fired Graham from Grand, accusing him of stealing $150,000 worth of product to sell for himself. Graham then began working for Grand of Missouri as a consultant. Soon after Graham was fired from Grand, Grand of Missouri stopped paying royalties to Grand even though it continued to produce Grand's products. In response, Grand obtained an injunction in federal district court enjoining Grand of Missouri and its agents from using Grand's trade secrets.
 
 
 5
 At around the same time, Graham and the Buffingtons joined with John Schrag, Don Wubbena, and Bill Thomas to form a company called Mid-Continent Biological Laboratories, Inc. (MBL). MBL sold veterinary biological products. In 1981, Grand brought suit in federal district court against MBL, Schrag, and Wubbena (MBL Case), alleging that MBL had misappropriated Grand's trade secrets and was producing the same products that Grand of Missouri had produced under its licensing agreement. In November 1983, the court entered an interlocutory default judgment (Default Judgment) in the MBL Case. The court enjoined MBL and its agents from using or disclosing Grand's trade secrets, ordered MBL to return to Grand any documents or materials containing Grand's trade secrets, but deferred quantifying monetary damages until the trial of other claims against Schrag and Wubbena. In March 1986, the court entered final default judgment against MBL in the amount of $1,785,000 (MBL Judgment). Grand never collected on this judgment.
 
 
 6
 In late 1983, after the Default Judgment was entered, Graham sent an inquiry to Oppenheimer Industries, Inc., of Kansas City, seeking investors to form a veterinary biological company. W.R. Jenkins, a Missouri entrepreneur, responded to Graham's inquiry. Jenkins and Graham met, discussed Graham's background in veterinary biological products, and inspected several properties suitable for starting the company. Jenkins then approached KCSI about acquiring the properties. Phillip Brown, a KCSI vice president, toured the properties and met with Graham and Jenkins to discuss the veterinary biological products industry.
 
 
 7
 In the spring of 1984, the properties were purchased in the name of Northern Farms, Inc., a company owned equally by Jenkins and KCSI. The purchase included a 329-acre farm in Irwin, Missouri, a 160-acre farm in Lamar, Missouri, and a building in Lamar. On May 1, 1984, Brown incorporated a new company called Midcontinent Biological Labs USA, Inc. (MBL II) to produce veterinary biological products. Initially, Northern Farms was the sole shareholder of MBL II. In June 1984, MBL II changed its name to Midcon. In early 1985, Jenkins decided he did not want to participate in the project, so Northern Farms sold all of the Midcon stock to KCSI. Midcon later became a subsidiary of PVI, Inc., which was a wholly-owned subsidiary of KCSI.
 
 
 8
 Midcon hired Graham and other consultants to assist in developing products. It sold veterinary biological products until 1988. A few months before Midcon ceased operations, Grand filed the instant lawsuit against KCSI and Midcon.[2] The third amended complaint contained six counts, four alleging that defendants had knowingly misappropriated Grand's trade secrets relating to veterinary biological products (Counts I, II, III, and VI) and two alleging that defendants were liable for the MBL Judgment because Midcon was a "mere continuation" of MBL and MBL had fraudulently transferred its assets to Midcon to avoid paying the judgment (Counts IV and V).
 
 
 9
 The district court bifurcated Counts I, II, III, and VI for trial separate from Counts IV and V. In May 1992, shortly before trial, the parties reached a settlement as to Counts I, II, III, and VI. The settlement agreement provided that in exchange for payment, Grand agreed to release defendants "from any and every claim, demand, cause of action and item of damage which was directly or indirectly alleged or claimed in Counts One, Two, Three, and Six of the Third Amended Complaint." In response to the settlement, the court dismissed Counts I, II, III, and VI with prejudice.
 
 
 10
 The district court denied defendants summary judgment on Counts IV and V, however, and those counts proceeded to trial. At the conclusion of Grand's case and at the conclusion of all of the evidence, defendants moved for judgment as a matter of law. The district court denied both motions and submitted Counts IV and V to the jury along with the issue of punitive damages. The jury found that Midcon was liable as MBL's successor corporation for the MBL Judgment on both "mere continuation" and fraudulent transfer grounds, that KCSI was liable for the MBL Judgment under a "piercing the corporate veil" theory, and that KCSI was liable for $6,400,000 in punitive damages. After the verdict was issued, defendants again moved for judgment as a matter of law. The district court denied the motion and defendants timely appealed.[3]
 
 II. DISCUSSION
 
 11
 Defendants raise two primary arguments on appeal: (1) that Grand failed as a matter of law to prove that Midcon is liable as MBL's successor corporation for the MBL Judgment, and (2) that the district court erred in submitting the issue of punitive damages to the jury. We agree and hold that Grand failed to show that Midcon is liable under a fraudulent transfer theory or that Midcon was a mere continuation of MBL. Moreover, because Grand failed to establish Midcon's underlying liability for the MBL Judgment, as a matter of law KCSI is not liable for that amount nor is it liable for punitive damages.
 
 A. Successor Liability
 
 12
 Defendants argue that Grand failed to prove that Midcon is liable as a successor corporation for the MBL Judgment. Specifically, they claim that, as a matter of law, Grand did not prove that there was a fraudulent transfer of assets from MBL to Midcon or that Midcon was a mere continuation of MBL. We review the district court's denial of defendants' posttrial motion for judgment as a matter of law.[4]
 
 1. Standard of Review
 
 13
 In reviewing the district court's denial of a motion for judgment as a matter of law, this court must: (1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts supporting the nonmovant which the evidence tended to prove; (3) give the nonmovant the benefit of all reasonable inferences; and (4) affirm the denial of the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn. Hastings v. Boston Mut. Life Ins., 975 F.2d 506, 509 (8th Cir.1992).
 
 
 14
 We note that defendants do not argue that the jury instructions on the successor liability issues were erroneous; they only argue that Grand did not make a submissible case on these issues under applicable Iowa law. In determining whether the district court erred in denying a motion for judgment as a matter of law, " 'it is the applicable law which is controlling, and not what the ... court announced the law to be in [its] instructions.' " Hanson v. Ford Motor Co., 278 F.2d 586, 593 (8th Cir.1960) (quoting Coca Cola Bottling Co. of Black Hills v. Hubbard, 203 F.2d 859, 862 (8th Cir.1953)). Thus, " '[t]his Court must ascertain for itself what the applicable law is,' " regardless of whether the appellant challenges the instructions and whether the instructions were correct. Johnson v. United States, 434 F.2d 340, 343 (8th Cir.1970) (quoting Hubbard, 203 F.2d at 862); see also Boyle v. United Technologies Corp., 487 U.S. 500, 513-14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988). " 'A proper motion for [judgment as a matter of law] will always preserve for review the question whether under the law truly applicable to the case there was an adequate evidentiary basis for the submission of the case to the jury.' " Johnson, 434 F.2d at 343 (quoting Hubbard, 203 F.2d at 862).
 
 2. Iowa Successor Liability Law
 
 15
 Both parties correctly point out that Iowa law governs the substantive successor liability issues in this case because jurisdiction is based on diversity of citizenship. We must apply the substantive law of Iowa, the forum in which the district court sits. B.B. v. Continental Ins. Co., 8 F.3d 1288, 1291 (8th Cir.1993). The decisions of the Iowa Supreme Court as to state law are binding on this court. Id. Our task is to attempt to rule as an Iowa court would if presented with the same issues. Mozeke v. International Paper Co., 856 F.2d 722, 724 (5th Cir.1988).
 
 
 16
 In Iowa, a corporation that acquires the assets of another company generally will not be held liable for the debts of that company. There are, however, limited exceptions to this rule. A corporation that purchases the assets of another corporation will be held liable for the latter's debts "when: (1) there is an express agreement to assume liability; (2) there is a consolidation or a merger; (3) the purchasing corporation is a 'mere continuation' of the selling corporation; or (4) the transaction is fraudulent." C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, 412 N.W.2d 593, 597 (Iowa 1987). Grand argued at trial that exceptions (3) and (4) apply here.[5]
 
 
 17
 (i) Fraudulent Transfer of Assets
 
 
 18
 Defendants argue that Grand failed to make a submissible case that Midcon is liable for the MBL Judgment under the fraudulent transfer exception to the nonliability of successors. Iowa courts have not elaborated on the elements of such a claim. Authorities suggest, however, that "the fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances." Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1426 (7th Cir.1993) (citing 15 Fletcher Cyclopedia of the Law of Private Corporations Secs. 7125, 7129 (1990 rev. ed.)). Moreover, the parties both cite C. Mac Chambers Co., which involved a fraudulent conveyance claim, for support on this issue. Because we find nothing to the contrary in Iowa law, we believe that the Iowa law of fraudulent conveyances applies to Grand's claim that MBL fraudulently transferred assets to Midcon.
 
 
 19
 "A fraudulent conveyance is ... 'a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights.' " Graham v. Henry, 456 N.W.2d 364, 366 (Iowa 1990) (quoting 37 Am.Jur.2d Fraudulent Conveyances Sec. 1, at 691 (1968 & 1988 Supp.)). To recover on a fraudulent conveyance claim, a plaintiff-creditor must first show that the transferor actually owned the property that it allegedly fraudulently transferred. See 37 Am.Jur.2d Fraudulent Conveyances Secs. 100, 102, at 782, 783 (1968); see also Harvey v. Phillips, 193 Iowa 231, 186 N.W. 910, 913 (1922) (explaining that "[w]here property is purchased by the husband with his wife's money, and he takes title in his own name without her consent, there is a resulting trust in her favor, and under such circumstances a subsequent conveyance to the wife is not fraudulent as to [the husband's] creditors"). Moreover, the plaintiff-creditor must show that it was prejudiced by a transfer of assets. C. Mac Chambers Co., 412 N.W.2d at 596. Prejudice requires the creditor to "show that [it] would have received something which has become lost to [it] by reason of the conveyance." Id.
 
 
 20
 We hold that the district court erred in submitting the fraudulent transfer issue to the jury because Grand did not produce sufficient evidence that MBL fraudulently transferred assets to Midcon. First, Grand relies on evidence allegedly showing that MBL transferred trade secrets, which were worth $6.5 million, to Midcon. Even assuming the evidence supports that such a transfer was made, it does not support a finding of liability under a fraudulent transfer theory because MBL did not own the trade secrets; indeed, Grand admittedly owned the trade secrets and claimed that MBL stole them. See Dist.Ct. Doc. No. 168, at 3, 12 (May 6, 1992). A transfer of property in which the transferor has neither legal nor equitable title does not work to defraud the transferor's creditors. See, e.g., Harvey, 186 N.W. at 913; 37 Am.Jur.2d Fraudulent Conveyances Sec. 102, at 783. Thus, any transfer from MBL to Midcon of Grand's trade secrets is irrelevant to the fraudulent transfer exception.[6]
 
 
 21
 Grand's other evidence on the fraudulent transfer issue is similarly deficient. Grand cites the following evidence: Gary Buffington's testimony that when he left the company in 1982, MBL had equipment and inventory worth $500,000; Phillip Brown's deposition testimony[7] that Graham transferred some equipment "that probably went to Northern Farms first and then was transferred by Northern to Midcon"; Brown's deposition testimony that when Northern Farms acquired the two farm properties and building in 1984 from third parties, some inventory was on the Lamar, Missouri, property from which MBL had run its operations; Graham's deposition testimony that he received no consideration for the transfer of his own assets to Midcon; and the deposition testimony of Gerald Schlink, a Midcon employee, that when he began working for Midcon in January 1985, the company "had an inventory of some [biological veterinary] products on hand." We note in addition that Pankratz, Grand's owner, summarily testified at trial that MBL transferred $250,000 worth of assets to Midcon.
 
 
 22
 Even assuming that the jury was entitled to find from this testimony that MBL transferred some of its own assets to Midcon for inadequate consideration, there is insufficient evidence that Grand was prejudiced by the asset transfer. Grand can cite no evidence, for example, that MBL had no other creditors, that Grand was entitled to priority over other creditors to any extent, much less to the extent of the assets allegedly transferred, or that the assets that MBL allegedly transferred were unencumbered. See C. Mac Chambers Co., 412 N.W.2d at 597 (holding that creditors with unperfected security interests were not prejudiced where corporation transferred assets subject to perfected security interest worth less than the amount of the perfected interest). In short, Grand failed to meet its burden of showing that it would have received something had MBL not transferred assets to Midcon. See id. at 596-97. Thus, we hold that the district court erred in denying defendants' posttrial motion for judgment as a matter of law on Grand's claim that Midcon is liable for the MBL Judgment under a fraudulent transfer theory.
 
 
 23
 (ii) Mere Continuation
 
 
 24
 Defendants argue in addition that Grand failed to make a submissible case that Midcon was a mere continuation of MBL under Iowa law. "The mere continuation exception [to the nonliability of successors] applies when the [transferee] corporation is merely a continuation or reincarnation of the [transferor] corporation." Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir.1985). "In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the [transferor]--not whether there is a continuation of the [transferor]'s business operation." Id. Indeed, " '[t]here must be something more than a mere succession in business to charge the [transferee] with the debts or delinquencies of the [transferor].' " Nelson v. Pampered Beef-Midwest, Inc., 298 N.W.2d 281, 287 (Iowa 1980) (quoting Allen v. North Des Moines Methodist Episcopal Church, 127 Iowa 96, 102 N.W. 808, 809-10 (1905)).
 
 
 25
 The traditional mere continuation exception focuses on the continuation of management and ownership between the predecessor and successor corporations. Thus, " '[t]he key element of a "continuation" is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.' " Bud Antle, Inc., 758 F.2d at 1458-59 (quoting Leannais v. Cincinnati, Inc., 565 F.2d 437, 440 (7th Cir.1977)). In Weaver v. Nash International, Inc., 730 F.2d 547, 548 (8th Cir.1984), for instance, we applied Iowa law and held that a successor corporation was not a "mere continuation" of its predecessor where the two corporations had different owners. See also Bud Antle, Inc., 758 F.2d at 1459 (holding mere continuation exception inapplicable where there was no continuation in management and ownership) (applying Georgia law); Tucker v. Paxson Mach. Co., 645 F.2d 620, 625-26 (8th Cir.1981) (holding mere continuation exception inapplicable where there was no continuation in management and ownership) (applying Missouri law).
 
 
 26
 It is important to distinguish the mere continuation exception from two relatively new theories of successor liability that courts have developed in some jurisdictions. These theories resemble the mere continuation exception in that both focus on certain elements of continuity between predecessor and successor corporations. They are fundamentally different from the mere continuation exception, however, because continuity of ownership and management is not dispositive under either one. One such theory is the "product line" exception to the nonliability of successors. Under the product line exception, " 'a party which acquires a manufacturing business and continues the output of its line of products ... assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.' " DeLapp v. Xtraman, Inc., 417 N.W.2d 219, 220-21 (Iowa 1987) (quoting Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal.Rptr. 574, 582, 560 P.2d 3, 11 (1977)). Thus, even if a successor corporation has different ownership and management, it may still be liable under the product line exception for injuries that its predecessor caused. This exception applies only in products liability cases. See Florom v. Elliott Mfg., 867 F.2d 570, 578 (10th Cir.1989). Moreover, in DeLapp, 417 N.W.2d at 222-23, the Iowa Supreme Court squarely rejected the product line exception.
 
 
 27
 The other new theory of successor liability that courts have developed is the "continuity of enterprise" exception. Like the product line exception, the continuity of enterprise exception is "significantly different" from the mere continuation exception. Florom, 867 F.2d at 578 n. 3. Under this exception, the focus is on the continuity of the seller's business operation and not the continuity of its management and ownership. Thus, using a kind of "totality of the circumstances" approach, courts look at factors such as whether the successor corporation used the same employees, business location, assets, and trade name and produced the same products as the predecessor to determine if there was a continuity of the predecessor's enterprise. See, e.g., Cyr v. B. Offen & Co., 501 F.2d 1145, 1151-53 (1st Cir.1974); Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873, 883-84 (1976). Like the product line exception, the continuity of enterprise exception applies only in the products liability context. See Bud Antle, Inc., 758 F.2d at 1458 n. 1.
 
 
 28
 It is against this background that we must view Iowa cases on the mere continuation exception. The cases uniformly recite that Iowa recognizes the four traditional exceptions to the nonliability of successors, one of which is the mere continuation exception. Although none of the cases elaborate on the elements of a mere continuation claim, the DeLapp court explained that Iowa follows the "traditional rule[ ]." 417 N.W.2d at 220. Thus, were it not for Iowa's most recent case on the mere continuation exception, C. Mac Chambers Co., we would have little difficulty concluding that Iowa requires continuity of management and ownership to satisfy the mere continuation exception.
 
 
 29
 At first blush, however, C. Mac Chambers Co. casts doubt on the idea that Iowa follows the traditional rule. In that case, defendant In Mook Kim operated martial arts teaching centers in Iowa. The business (Academy I) was incorporated in Iowa and Kim was the sole shareholder, officer, and director. When Academy I was on the verge of bankruptcy, Kim's son, Ki Tae, formed a new corporation (Academy II). Although he did not pay for any stock nor was he involved in running the business, Ki Tae Kim became the sole shareholder, officer, and director of Academy II.[8] In all other respects, however, Academy II was the functional equivalent of Academy I.
 
 
 30
 The court held that Academy II was a mere continuation of Academy I. 412 N.W.2d at 597. It rejected defendants' argument that Academy II was not liable for Academy I's business debts solely because (1) there was no identity of shareholders, officers, and directors between the two corporations and (2) both corporations were still in existence after the sale of assets. Id. The court held that although "the two foregoing factors are traditional indicia of a continuing corporation, neither is essential." Id. Rather, the court concluded, that the businesses were identical in every other respect compelled the conclusion that Academy II was a mere continuation of Academy I. See id. The court found that Ki Tae Kim "was made the sole director and shareholder [of Academy II] for only one reason: to attempt to avoid liability under the continuation corporation theory." Id.
 
 
 31
 We believe that C. Mac Chambers Co. merely carves out a narrow exception to the traditional mere continuation theory's requirement that there be a continuation of management and ownership between the predecessor and successor corporations. Specifically, we believe that the case stands for the unremarkable proposition that parties cannot circumvent the mere continuation exception by inserting relatives as sham owners and directors of a new company that is in substance the predecessor. Thus, outside of those cases where the successor corporation's ownership and management is different in form but not in substance, we do not believe that Iowa has departed from the traditional requirement of the mere continuation exception that there be a continuity of management and ownership between the two companies at issue.[9] Nor do we believe that C. Mac Chambers Co. represents the sub silentio adoption of a "modified" continuation exception under which courts are to balance numerous factors, two of which are continuity of management and ownership, relating to the operations of the two companies in a totality of the circumstances test.
 
 
 32
 Several factors support our reading of C. Mac Chambers Co. First, three months after it decided C. Mac Chambers Co., the Iowa Supreme Court squarely rejected the product line exception. See DeLapp, 417 N.W.2d at 222-23. To read C. Mac Chambers Co. as eliminating the requirement of continuity of ownership and management in mere continuation cases would be fundamentally inconsistent with DeLapp.[10] Second, courts have applied these modified continuation exceptions only in the area of products liability. It would be unreasonable to hold that C. Mac Chambers Co. adopted such a modified continuation exception in a case not involving a products liability claim, much less that it would make such a fundamental change in successor liability law without even stating that it was doing so or mentioning the continuity of enterprise exception.
 
 
 33
 Finally, C. Mac Chambers Co. cited the district court opinion in Weaver v. Nash International, Inc., 562 F.Supp. 860 (S.D.Iowa 1983), aff'd, 730 F.2d 547 (8th Cir.1984), without disavowing or even commenting on its holding or analysis. In Weaver, the district court thoroughly discussed the traditional mere continuation exception and how some jurisdictions had expanded it through the product line and continuity of enterprise theories. See id. at 863-64. The court, however, found no evidence that Iowa "would choose to depart from the traditional rules regarding the liability of successor corporations." Id. at 863. For this reason, the court held that a successor corporation was not liable under the mere continuation exception where there was no continuity of ownership and management. Id. at 864.[11] If the C. Mac Chambers Co. court had intended to reject the court's analysis in Weaver, which explained that Iowa follows the traditional mere continuation exception, we believe that it would have done so explicitly. Thus, we do not believe that C. Mac Chambers Co. eliminated the mere continuation exception's general requirement that there be continuity of management and ownership between successor and predecessor corporations; rather, the case merely created a limited exception to the rule.
 
 
 34
 In light of our reading of C. Mac Chambers Co., we hold that the district court erred in denying defendants' posttrial motion for judgment as a matter of law. Grand produced no evidence that there were any common shareholders between MBL and Midcon; indeed, the undisputed evidence was that Northern Farms, which was owned by Jenkins and KCSI, first owned Midcon and then sold the stock to KCSI. "KCSI owned all the stock of Midcon through its wholly owned subsidiary PVI." Appellee's Br. at 10. The only common officer was Graham, who became a Midcon vice president in 1986, two years after the company was incorporated. It is undisputed that MBL and Midcon had no common directors.
 
 
 35
 Moreover, unlike the case in C. Mac Chambers Co., Grand produced no evidence that Midcon's owners were sham owners who collaborated with MBL's shareholders to avoid MBL's debts. For instance, Grand produced no evidence that KCSI and PVI lacked a real financial stake in Midcon. To the contrary, the undisputed evidence showed that KCSI and PVI funded Midcon with over six million dollars of their own funds. Moreover, Grand failed to establish that Graham or any of MBL's shareholders actually owned Midcon in substance or had an ownership interest in Northern Farms, KCSI or PVI. In short, no reasonable jury could find that MBL and Midcon had common ownership either in form or in substance.
 
 
 36
 Further, Grand produced no evidence that Midcon's directors and officers were not "involved in the running of the business." C. Mac Chambers Co., 412 N.W.2d at 597. It did produce evidence that Graham was Midcon's key employee and the only person associated with the corporation with knowledge of the veterinary biological products industry. Defendants, however, produced uncontradicted evidence that Midcon's directors and officers--none of whom, besides Graham, were involved in MBL--were actively involved in running the business. See, e.g., VII Tr. at 1097; VI Tr. at 1042; Appellee's App. at 57. Thus, unlike the case in C. Mac Chambers Co., there was no evidence from which a jury could conclude that the managers of the successor corporation were mere figureheads. Because Grand showed that the only substantive continuity in management and ownership between MBL and Midcon was that Graham was an officer of Midcon, we believe that Iowa courts would hold that, as a matter of law, Midcon was not a mere continuation of MBL. See Weaver, 730 F.2d at 548. Thus, we hold that the district court erred in denying defendants' motion for judgment as a matter of law on Grand's claim that Midcon is liable for the MBL Judgment under the mere continuation exception.[12]
 
 B. Punitive Damages
 
 37
 Defendants next argue that the district court erred in submitting the issue of KCSI's liability for punitive damages to the jury. We agree and hold that Grand is not entitled to punitive damages. In Iowa, "actual damages are necessary to support a claim for punitive damages." Sundholm v. City of Bettendorf, 389 N.W.2d 849, 853 (Iowa 1986). We have held that Grand failed to show that it suffered actual damages on either of the two claims that went to trial. See Part II.A. Thus, under Sundholm, Grand may not recover punitive damages.
 
 III. CONCLUSION
 
 38
 For the foregoing reasons, we reverse the judgment of the district court.
 
 
 
 *
 THE HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Product outlines describe how to make the products. An outline is "basically like a cake recipe." IV Tr. at 603
 
 
 [2]
 Grand named several other KCSI subsidiaries as defendants. These subsidiaries were dismissed as defendants pursuant to the district court's order of August 26, 1993. Grand does not cross-appeal this dismissal
 
 
 [3]
 The district court initially entered judgment only against Midcon for the $1,785,380 MBL Judgment. Defendants filed an appeal to this judgment. We then granted the district court leave to amend the judgment to reflect the jury's finding that KCSI was also liable for the MBL Judgment. Defendants filed a notice of appeal to this amended judgment as well
 
 
 [4]
 We do not directly address the merits of defendants' preverdict challenges to the sufficiency of the evidence. See Lama v. Borras, 16 F.3d 473, 476 & n. 5 (1st Cir.1994)
 
 
 [5]
 Most jurisdictions hold that a prerequisite to the imposition of liability against a corporation under any of the four exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor. See Acheson v. Falstaff Brewing Corp., 523 F.2d 1327, 1329-30 (9th Cir.1975); see also Williams v. Bowman Livestock Equip. Co., 927 F.2d 1128, 1132 (10th Cir.1991) (applying Oklahoma law). Iowa courts have not spoken directly on this issue. Cf. DeLapp v. Xtraman, Inc., 417 N.W.2d 219, 220 (Iowa 1987) (explaining that "[t]he general rule is that where one company sells or otherwise transfers all its assets to another company, the purchasing company is not liable for the debts and liabilities of the transferor" and then listing the four exceptions (emphasis added)). In light of our disposition of the case, we need not decide what Iowa courts would hold on the issue
 
 
 [6]
 Our analysis might be different had Midcon prospered financially by exploiting Grand's trade secrets. Because Midcon failed, however, that issue is not before us
 
 
 [7]
 The district court admitted designated portions of several witnesses' depositions at trial
 
 
 [8]
 In Mook Kim later became an officer of Academy II. See 412 N.W.2d at 595
 
 
 [9]
 Grand cites no other Iowa cases, and we know of none, in which the court found a successor corporation with different owners liable under the mere continuation exception. In Arthur Elevator Co. v. Grove, 236 N.W.2d 383, 391-93 (Iowa 1975), a partnership changed its form of business organization to a corporation. Although the case did not say so explicitly, we believe that the two organizations had common ownership. See Nelson, 298 N.W.2d at 287-88
 
 
 [10]
 The facts of Ray v. Alad Corp., the seminal product line exception case that DeLapp rejected, illustrate the inconsistency. In Ray, Alad Corp. (Alad I) was sold to new owners, who formed a new corporation (Alad II). Alad II acquired Alad I's plant, equipment, inventory, trade name, and goodwill, and continued to manufacture the same product under the same name and with the same equipment, designs, and personnel. 136 Cal.Rptr. at 575-76, 560 P.2d at 4-5. The Ray court found that Alad II was liable as a successor for injuries that the plaintiff suffered using a product manufactured by Alad I. Id. at 582, 560 P.2d at 11. Under a broad reading of C. Mac Chambers Co., a company like Alad II would be liable under a mere continuation theory because virtually everything about the two companies was the same except for the management and ownership. DeLapp, however, rejected the Ray result as "theoretically irreconcilable with [Iowa's] ... law of corporate liability." 417 N.W.2d at 222
 
 
 [11]
 The court also noted that the predecessor corporation "existed for at least some time after the [successor] purchased the assets of the [predecessor]." 562 F.Supp. at 864. Here, MBL existed until November 1984, six months after Midcon was incorporated
 
 
 [12]
 Because we hold that Grand did not produce sufficient evidence that Midcon is liable for the MBL Judgment, as a matter of law KCSI is not liable for the MBL Judgment as Midcon's parent corporation under a "piercing the corporate veil" theory