Tilman M. DICKERSON,
et al., Plaintiffs,

v.

CENTRAL UNITED LIFE INSURANCE CO., f/k/a Life of America Insurance Co., et al., Defendants.

No. 5:93–cv–250–2(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Aug. 1, 1996.

---

See also, 893 F.Supp. 1085.

William C. Lanham, Clark H. McGehee, Atlanta, GA, for Tilman M. Dickerson, Margaret A. Dickerson.

Kaye Woodard Burnwell, Atlanta, GA, A. William Loeffler, Atlanta, GA, Jeffrey Lloyd Joyce, Houston, TX, for Life of America Insurance Company.

Wallace Miller, III, Craig Cowart, Macon, GA, for Midland National Life Insurance Company, Reserve Life Insurance Company.

### ORDER

OWENS, District Judge.

Before the court is a motion by defendant Life of America Insurance Company ("Life of America") to vacate the court's order of April 17, 1996, which granted plaintiffs' motion to amend the pre-trial order "so as to change the name of defendant Life of America Insurance Company to Central United

Life Insurance Company, f/k/a Life of America Insurance Company." [Tab # 86]. After carefully considering the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

## FACTS

In 1987, plaintiffs dropped their existing health insurance policy with Union Bankers and purchased a policy offering similar benefits from defendant Reserve Life Insurance Company ("Reserve"). Plaintiffs switched to the Reserve policy because of Reserve's assurances that the policy was "non-cancellable" and "guaranteed renewable for life" as long as premiums were timely paid. Reserve also assured plaintiffs that the premiums owed by plaintiffs under the policy could not be raised unless the premiums for all policies of the same form number (PCM86), class, age class, and state of issuance were raised concurrently.

In 1989, after having marketed the PCM86 policy for three years, Reserve ceased marketing the policy, an act known in the insurance industry as "closing" the block of business. It is widely known throughout the insurance industry, but not to the general public, that closing a block of business, by ensuring that no new insureds will enter the pool covered by the policy, inevitably leads to a decrease in the size of the pool as healthy insureds switch to cheaper policies. This in turn leads to increased premiums, as the risks and costs associated with the pool are shared by fewer and fewer people. As the premiums increase, more healthy insureds flee the policy, leaving only those unhealthy insureds who cannot find insurance elsewhere, and leading to even higher premiums (Depo. of Stanley L. Miller, Exh. 2, at 2).

This vicious circle of higher premiums and a shrinking pool to share the increased costs is known in the insurance industry as a "death spiral," and is most common in those sectors of the industry that sell policies covering small groups and individuals. In a death spiral situation, eventually the premiums increase to the point where they become unaffordable to the vast majority of policyholders, at which point the insured fails to pay the premium and the policy lapses.

Once the pool shrinks to a mere fraction of what it was, the reserves set aside by the insurance company to pay for claims filed by the pool are no longer needed, and can be retained by the company as unallocated cash assets.

At no time during the sale of the policy or afterward were plaintiffs informed that their policy group could be closed, nor were they informed that it had in fact been closed. Even when Mr. Dickerson inquired, at first directly and later through his attorney, as to the cause for the initial 100% premium increase in 1989 (from $1,192.56 to $2,350.32 annually), Reserve did not tell him that the increase was at least in part caused by the block having been closed, but rather told him that the premium increase was due to an unusual number of claims in Georgia that year, and that premium increases in the future would average three to five percent annually [Tab # 59 Exh. A, Exh. 1]. Had Reserve informed plaintiffs that the block had been closed, and that this would continue to result in rapidly escalating premiums, plaintiffs would have been able to switch to another insurance company as neither was suffering from major health problems at the time.

Reserve was merged into defendant Midland Life Insurance Company ("Midland") in 1990. Then, in early 1991, Midland entered into a reinsurance agreement with defendant Life of America whereby Life of America assumed all administrative responsibilities for, and all rights and liabilities under, the policy. Although it had started as a company that sold policies, Life of America was by this time almost exclusively in the business of buying and administering closed blocks of insurance.

As of April 1, 1991, the premium for both plaintiffs to be covered under the policy had risen to $5,322.72 per year. On June 27, 1991, plaintiffs were informed that their premiums would increase from $5,322.72 per year to $23,829.00 per year. Plaintiffs then inquired about alternative coverage arrangements that might be made to reduce the premium amounts on the policy. On August 29, 1991, plaintiffs were informed that even if they dropped Mrs. Dickerson from the poli-

cy, the premium for coverage for Mr. Dickerson alone would be $75,690.00 per year. Plaintiffs subsequently failed to pay the premium and their coverage under the policy lapsed. After their Reserve/Life of America policy lapsed, plaintiffs attempted to acquire insurance from several other companies, but were turned down due to their health problems, including kidney problems experienced by Mr. Dickerson. As a result of their inability to obtain coverage, plaintiffs personally incurred medical costs in excess of $50,000, and had to forego a necessary kidney operation for Mr. Dickerson that they could not afford themselves. The record shows that had plaintiffs maintained their initial coverage with Union Bankers and never switched to the Reserve/Life of America policy, the premium for full coverage with a minimum deductible for both Mr. and Mrs. Dickerson would today be approximately $6,000 annually.

Plaintiffs filed suit in June 1993 against Life of America, Reserve, and Midland, alleging fraud, misrepresentation, bad faith, failure to honor the insurance contract, violations of insurance regulations, and intentional infliction of emotional distress. One month later, in July 1993, Life of America acquired Central United Life Insurance Company ("Central United"). On December 31, 1993, as part of a reorganization, all of Life of America's ongoing business was bulk reinsured with Central United, and the companies were consolidated into a single entity operating under the Central United name. Before and after the consolidation, the companies were both majority-owned by Harris Insurance Holdings (Depo. of David W. Harris, at 12–13, 190), and insurance industry reports compiled from official statements to the National Association of Insurance Dealers and questionnaires submitted by the companies themselves listed the companies as having the same address, an identical list of directors, and a nearly identical list of officers [Tab # 89, Exh. B–D]. According to Mr. Daniel George, vice-president of Life of America and of the consolidated entity, the consolidation's only real effect on the entity known as Life of America was a name-change, and all of Life of America's business

operations continued as they had before the consolidation took place [Tab # 89, Exh. E].

After the first pre-trial conference, but before the pre-trial order had been entered, plaintiffs filed a motion to amend the pre-trial order by changing the name of defendant Life of America to "Central United Life Insurance Company, f/k/a Life of America Insurance Company." On April 17, 1996, the court granted Plaintiffs' motion to amend the pre-trial order, but did not set forth the reasons that guided its decision. It does so now.

## DISCUSSION

■ Pretrial orders are governed by Federal Rule of Civil Procedure 16(e). That paragraph does not impose any limitation on the court's power to amend a pretrial order, unless the order follows a final pretrial conference, in which case the order "shall be modified only to prevent a manifest injustice." FED.R.CIV.P. 16(e). Thus, where the order does not follow a final pretrial conference, the court may permit the pretrial order to be amended "when the danger of surprise or prejudice to the opposing party is small and a failure to amend might result in an injustice to the moving party." *Computer Associates Int'l v. American Fundware*, 831 F.Supp. 1516, 1526 (D.Colo.1993) (quoting 6A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1527 at 287 (1990)). The decision whether to amend is solely within the discretion of the court. *Id.*

## SUCCESSOR LIABILITY

■ Defendant Life of America contends that the court's order amending the pretrial order to name Central United as defendant will do a substantial injustice because the requirements for holding one corporation the successor in liability to another corporation have not been met in this case. The court does not agree.

At the outset, it is important to distinguish between the original Central United, which was acquired by Life of America, and the entity now known as Central United, which is the result of the bulk reinsurance reorganization and consolidation that occurred between

Life of America and the original Central United. The issue is not whether Life of America succeeded to the liabilities of the original Central United, but whether the new entity now known as Central United succeeded to the liabilities of Life of America.

■ "Generally, a purchasing corporation does not assume the liabilities of the seller unless: (1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation." *Bullington v. Union Tool Corp.*, 254 Ga. 283, 328 S.E.2d 726, 727 (1985). Of these four exceptions, the court finds that at least two apply to the relationship between Life of America and the new, consolidated entity now known as Central United, thereby justifying the court in holding Central United a successor in liability to Life of America.

■ First, the transaction between Life of America and the new Central United was a de facto merger of the two corporations. A de facto merger occurs when one corporation is absorbed into another. *Howard v. APAC–Georgia, Inc.*, 192 Ga.App. 49, 383 S.E.2d 617, 618 (1989). The elements necessary for a finding of de facto merger are:

> (1) There is continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations. (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation. (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457–58 (11th Cir.1985) (construing Georgia law); *Howard*, 383 S.E.2d at 618–19.

All of these elements are met in the bulk reinsurance and consolidation transaction: there was and remains a continuity of management, assets, business, physical location, and shareholders between the now defunct entity Life of America and the new entity known as Central United. Accordingly, the court finds that the consolidation was a de facto merger of Life of America and Central United.

■ Second, the new, consolidated entity is a "mere continuation" of Life of America. "In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the seller." *Bud Antle*, 758 F.2d at 1458–59. The key element is a continuity of officers, directors, and shareholders. *Id.* "In Georgia, the common law continuation theory has been applied where there was some identity of ownership." *Bullington*, 328 S.E.2d at 727.

Here, where there is complete identity of ownership and virtual identity in management, the requirements for finding that Central United is a mere continuation of Life of America are clearly met.

For the foregoing reasons, the court finds that the requirements for holding Central United liable for claims against Life of America have been satisfied.

## CONCLUSION

■ The fact that Life of America no longer exists in name might make it difficult for plaintiffs to collect on a judgment, should one be awarded, and therefore failure to amend the pretrial order might result in an injustice to plaintiffs. On the other hand, because the management and shareholders of Life of America and Central United are identical, and have been notified of this suit from its commencement, there is no possibility that the amendment will surprise or prejudice defendant. Indeed, the lawsuit had been pending against Life of America for one month when the merger occurred. The only effect is to ensure that all potentially respon-

**1476**

sible entities are parties to this suit. Therefore, the court finds that the amendment to the pretrial order served the interests of justice and was properly granted.

The court has carefully considered defendant's remaining arguments, and finds them to be without merit.

Accordingly, the court's considered judgment is that defendant's motion to vacate is **DENIED** [Tab # 88].

**SO ORDERED.**